## McCann *v.* The State, 13 Smedes & Marshall, 471.

### Murder.

Circumstantial evidence has been received in every age of the common law, and it may rise so high in the scale of belief as to generate full conviction. When after due caution this result is reached, the law authorizes its ministers to act upon it.

What circumstances will amount to proof, can never be matter of general definition; the legal test is the sufficiency of evidence to satisfy the understanding and conscience of the jury. It is sufficient if they produce moral certainty, to the exclusion of every doubt; even direct and positive testimony does not afford grounds of belief of a higher and superior nature.

In cases depending upon circumstantial evidence, a number of links often concur in forming the chain. It cannot be said what bounds are to circumscribe the inquiry. All which may tend to elucidate the transaction should be admitted.

A jury may believe that part of a confession which charges the prisoner, and reject that part which is in his favor, if they see sufficient grounds for so doing.

The union and concurrence of various detached circumstances may produce full conviction, when either of them standing alone might leave room for much doubt.

An objection taken to an indictment, because it charges the offense as at common law, whilst the punishment is inflicted by statute, cannot prevail.

Error to Lowndes circuit court. Rogers, J.

At the September term, 1848, of the court below, the grand jury returned into court, through their foreman, an indictment against James McCann, for murder, and John F. Toland for being accessory to the murder of Andrew Toland.

The indictment contained two counts. The first against McCann, charging him with the murder of Andrew Toland by

shooting him with a pistol on the back of the head, on the 1st day of April, 1847. It is in the common law form, and concludes, "against the peace," &c.

The second count charges John F. Toland as accessory before the fact.

McCann was arraigned at the same term of the court, and pleaded not guilty; and it was ordered that Toland be tried separately, on his motion.

At the March term, 1849, the defendant was tried, and the following is the evidence adduced on the trial:

James J. Toland, a witness for the state, deposed, that on the 14th of April, 1845, on Monday night, in Lowndes county, Andrew Toland was killed; the body was found on Tuesday morning; he saw the body, ten or twelve feet from the road, the left foot over the right one; he was lying on his back; from his eyes down all his face was gone; his head was connected with the body by the skin on the back part of his neck; all the face bones and neck bones were gone; all the brains eaten out of the skull by the hogs; the hogs were eating the body when found; knew it was the body of Andrew Toland from the clothing and the bones of his feet; deceased was his uncle; the body was found about eleven miles from Columbus, near Profitsfield, on the right of the Gilmer road, near Cross' lane, some two or three hundred yards from the mouth of the lane, in a thicket of bushes. Witness was acquainted with the Gilmer road; it leaves the Robinson road beyond Westport; Whitfield's plantation is on it, four miles from Columbus; Mills' house is to the left of the road, seven or eight miles, and Gilmer's plantation to the right, ten miles from Columbus; Cross' plantation is to the right, and Profit's on the left side of the road; McGowan's is on the same road, twelve miles from Columbus; Lyon resides west of the road, about a mile from the Gilmer road. The McCann road intersects the Gilmer road at the corner of McGowan's field; there is a road running off from the Gilmer road, just this side of where the body was found, towards McCann's, by Lyon and Smith's lane, and a path turns off at the corner of Smith's field through the woods, which leads into the McCann road, which leads to McCann's house. A map of the road was shown to

witness (which was copied in the record), and he proved its correctness.   Newsom lived about a quarter of a mile from Mills', to the left of the road, and a thick wood was between the house and road; woods all the way from Gilmer's to where the body was found, and about three hundred yards beyond to Cross' lane, from that and on to McGowan's lane, about a mile; about one and a half miles to where Toland lived; near where the body was found, there was the mark of a ball on the sapling six feet from the ground; the ball struck the sapling diagonally from the road; knocked the bark off and fell to the ground.   Hamilton's lane is six miles from Columbus, Rowland's over six miles; it is three quarters of a mile from Gilmer's to where the body was found.   Witness knew the body and helped to lay it out, and has never seen Andrew Toland since.   The face was entirely gone, and there was a wound in the back of the neck; it looked like a slit three quarters of an inch long, when the skin was stretched, but when the skin was put its natural position it looked like a hole; he thought it was a bullet hole; his hat was powder-burnt and had blood on it; there was plenty of blood under his head, in his clothes, and on the ground.   No other wounds were on the body except where the hogs had broken the skin on his fingers.   The soil was red potash land.   There was a saddle on the ground with blood on the right stirrup leather.   Witness thought that single ball would not carry away all the face, but that the hogs had eaten it; the hogs could not have made the wound in the back of the neck, they could not have gotten to it to make it.   He saw no bones that the hogs had chewed; don't think that a ball could have blown the face away; he thought a musket loaded with twenty or thirty buckshot could have done it.   The skull was sound above the eyes, and the head was held on the body by the skin of the back of the neck; a good many persons were on the ground when witness got there; he left home about twelve o'clock.   He said further that a part of the skull bone on the right side was detached.

John P. Krecker testified, that he saw McCann, the prisoner, Frank Toland, an Irishman named Kinch, and another by the name of Mallory, eight or ten days before the murder, on the

Columbus bridge, in conversation together, some twenty or thirty feet on the bridge. Kinch was leading a horse; witness did not hear the conversation between them. McCann had his back towards witness; he put his hand in his pocket, and when he saw witness looking at him, he pulled some papers out of his pocket and put them into another pocket, again put his hand into his pocket, and pulled out something, and turned his back on witness; he saw Frank Toland take something out of his pocket like a powder gourd, put it to his mouth and pulled out the stopper, and poured something into McCann's hand; supposed it was powder; he thought their actions strange. The bridge was a retired place; they stood about there some twenty or thirty minutes. Witness was bridge keeper, and called to them to pay the toll. Kinch and Mallory passed on over, and Toland and McCann returned and paid toll. Witness saw and knew McCann four or five days afterwards; did n't know every one that crossed the bridge; he has often seen men pour powder out of a gourd into their own hands, but never into another's. The gourd was about the size of an orange. The singularity of their conduct attracted his attention. He said it was unusual for persons to act as they did.

Samuel T. Sappington testified that between nine and twelve o'clock on the day that Andrew Toland was said to have been murdered, Toland and McCann came to his grocery, and remained until about three o'clock in the afternoon. They were a great part of the time in a billiard room up stairs in a conversation together, at that time the billiard room being a private place. About one o'clock a young man by the name of Bird invited them to dine with them at Mr. Fletchall's. Toland at first refused to go, because he said his father was in town, but afterwards went. Witness did not know what they were doing up stairs; they appeared to be transacting business; they were very friendly, and frequently visited his house. Witness saw a pistol in his grocery that day or a day or two before; didn't know who left it; neither of the two shown was the one.

E. B. Gaston testified that he saw the prisoner with Frank Toland, the day before the news of the death of Andrew Toland reached town, near Sappington's, in an alley between the drug

store of Linceum and the cabinet shop, some ten or twelve feet from the street; saw them from his store through the window. From their gesticulations, witness thought they were quarrelling, and came to his door to see, and found them very friendly, with their arms around each other's necks.

Henry Sullivan testified that he was ferryman at Columbus. On the day of the murder McCann crossed the ferry going home, about two hours by sun. Andrew Toland, the deceased, crossed about one hour by sun, and Frank Toland when the sun was some twenty minutes high, or about sunset. Witness does not recollect all who crossed the ferry that day; Mr. Mize and several others crossed. He recollects about old Mr. Toland, Frank Toland, and McCann crossing, it being called to his mind so soon afterwards. Mr. Toland spoke to him about it, and he expected to be called to testify about it; didn't recollect whether McGowan's wagon crossed that day, nor all who crossed, it is so long ago; McCann, J. F. Toland, and Andrew Toland crossed the river, going in the direction of the Gilmer road.

Sandifer testified that he was in Columbus the day the old man was killed; was riding along the Gilmer road with Riddle, when McCann overtook them at Whitfield's lane, and rode with them some three or four miles; they stopped at Mills' and got water; saw deceased near Rowland's, riding behind a wagon; after riding about a quarter of a mile from Mills', McCann turned off about dark to go down to Newsom's; he overtook them about sundown; witness and Riddle kept the Gilmer road, and went some five or six miles beyond Prairie Hill; all passed the wagon together about seven miles from Columbus; McCann drank water at Mills'; from Mills' to Newsom's is some two or three hundred yards; they rode pretty much together, sometimes scattering; McCann was a little ahead when they parted; Newsom's is about one hundred yards from the road, with woods between the road and the house; don't think McCann said anything about supper. About a mile from Newsom's, at Gilmer's gate, a man passed them at full gallop; he was dressed in black, and had a cap on. Witness didn't recollect anybody being with old Mr. Toland when they passed him; he was riding just behind the wagon; they crossed the ferry when the sun was an

hour or an hour and a half high; no other white person overtook them that night after they passed the gate.

Riddle testified that he thought it was in the spring of 1845; a gentleman rode up to them some three or four miles from Columbus; said his name was McCann; they rode on together to Mills' and got water; went on together to Newsom's, where McCann said he was going to get supper, and asked witness if he would go down and get some, too; he saw old Mr. Toland at Hambleton's gate; there were several of them together; witness left town about an hour by sun; McCann overtook him where the sandy land meets the prairie, and they rode on to Newsom's together; they rode some four or five miles an hour; he thought old Mr. Toland rode not half so fast, that he was traveling slow behind a wagon; McCann told his name when he came up; he had whiskers and wore a black hat. After McCann left them, a man rode by them very fast; he was a small man with a cap on; they passed old Mr. Toland's house that night as they went on, but saw no horse standing in the yard.

Robert Profit testified that he saw old Mr. Toland on the morning of the day of the murder; he met him in the road coming from Columbus, riding a small sorrel sway-back mare; he stooped considerably and rode in that way; he heard the report of a gun or rifle an hour or a half an hour after dark, in the direction his body was found; it is nearly half of a mile from witness' house to the place; he met deceased at the northwestern corner of witness' field, and about half a mile behind him met McCann, coming toward Columbus; first saw McCann in the narrow lane between Cross' and McGowan's; they passed the residence of the deceased that morning, but did not stop; before they got to the house they saw Frank Toland and his mother standing in the yard in apparently close conversation; when he rode opposite the house they parted; Frank was dressed in black with a cap on. Old Mr. Toland was dressed in a light summer coat and a broad-crown hat; McCann was riding a pretty good-sized sorrel horse, not very tall, but good sized; witness saw the body and examined it; all except the top, the head had disappeared; there was a wound on the back of the neck marked with powder, the hat was powder-burnt; saw the

ball-mark on the tree six feet from the ground; he saw no other wound on the body; he could see no other wound on the body; could see no appearance of horse tracks on the ground; other people were there before witness; the body was thirty or forty feet from the road, in a clump of post oak bushes; there were tracks to the right of the road along the road, but none traceable that turned out of the road. Witness was on the jury of inquest, and no accusation was made against any one. The coroner's jury met on the ground about twelve o'clock, and commenced their investigations about dark, and got through about ten o'clock P. M. The wound was about one inch long, and appeared as if made by a bullet; when the head was down the wound was round, the hogs had eaten the face away; all the face bones were gone; nothing was left but the skull. Witness heard the report of a gun about a half an hour or an hour in the night; there was no horse in the yard when witness passed Mr. Toland's in the evening.

Josiah S. Morehead testified that he saw the body of Andrew Toland, after he was killed, near the road-side at Profit's fence; he saw hogs eating him; he was riding along the road coming to town; first saw the hat, and got down to take it up, when his horse scared, and thus he first discovered the body; he saw the prisoner and his father that morning, four or five miles from there, going to witness' father's house; he stopped to talk with them; they were going to witness' father to get bail, the grand jury having found a true bill against them for an assault with intent to kill; prisoner appeared to hurry his father, and urged him to go on; when witness picked up the hat, he saw that there was blood and smoke on it, and blood in the road under witness' feet; he saw where the body was dragged, as if to throw it between the logs, and then drawn to the thicket, the body lying on the back, with the hands on the back.

George E. Lyon testified that he lived a mile and a half from Cross' lane; heard the report of a gun a while after dark, about a half an hour or an hour, in the direction the body was found; some ten or twenty minutes after heard a horse running from that direction; the horse was galloping, but witness did not see it; went in south-westerly direction through Smith's lane, and

turned off at a corner of a field through a woods path that intersects the McCann road; prisoner lived with his father at the time; witness was at his shop at the time about fifty yards from the road; Smith's lane is one half a quarter long; report of gun was loud; he heard it distinctly; witness thought it was some one shooting turkeys; it was a moonlight night, with flying clouds; one not acquainted with the road, would not have taken that direction.

James Whitfield testified that he was on the inquest; saw the hat, a new chip one, and powder-burnt; deceased had an old round-top hat in one of his pockets; the wound on the back of the neck was powder-burnt, and the skin black and dark.

O. H. Millican testified that he was on the inquest; saw the ball mark on a small tree, and a twig cut therefrom on the side next the road, about on a level with the mark; witness examined the wound on the back of the neck; the face was all gone.

John Cross testified that Morehead found the body and came and told him; he went to see it, and then went to inform the neighbors; did not get back until after dinner; the body was lying on the back, with the feet from the road; was present before the jury; no one was accused of the murder at the time.

—— Morehead testified that the prisoner was at his house between seven and eight o'clock the morning the body was found; he appeared natural and staid an hour or three quarters; he came with his father, and wanted his father to go, after sitting a few minutes; after a while he again wished his father to go; the father told him " not to be in a hurry—it is not often we get with our friends;" the bottle was handed round, and the old man took two drinks; prisoner said again, " Let us go; if you don't, I will," and got up, and looked out to where the horses were tied; witness couldn't say why prisoner wished to get his father off; has seen the old man pretty merry.

Joseph Morehead testified that he saw prisoner at his house the next day after the murder; he appeared to be uneasy; got up and went to door and looked up and down the lane twice. Witness took the bottle out and treated the old man. McCann lived four miles from witness. Prisoner twice asked his father to go, and then said, with an oath, if he would not go he would leave him.

Henry N. Jones testified that he examined the wound on the body at the back of the neck; it was powder-burnt; the flesh was about the thickness of a man's hand; some powder-burn inside of the wound, and a blackness about where the ball struck and entered. Witness saw the tree where the ball struck.

Nich. Morgan testified that he heard the report of a gun in the direction where Toland was killed; shortly after the report he heard a person riding up Smith's lane; first heard the riding in the lane between Lyon's and Smith's fields; heard Lyon's dogs break out; the rider turned off into the woods at the corner of Smith's field intersecting the McCann road, in the direction of McCann's house; from where the horse turned off at the corner of Smith's field to the neighborhood road leading out to McCann's is not very far; a stranger would hardly have seen the neighborhood road; witness was about half a mile from the place of killing, when he heard the gun distinctly; the sound of the report was ordinary; could not see the horse distinctly; saw a glimpse of him and some one on him; witness could not tell whether the report was that of a pistol or not; the night was still and calm.

Henry Quarles testified that on the day the body was found, he saw McCann going westwardly; he looked like he was going off; had no saddle-bags that witness recollects; it was three or four miles from Cross' lane, between twelve and two oclock; his brother Pat was with him; they were going through the woods and riding fast for going through the woods; witness had not then heard of the death of Andrew Toland, but heard it an hour afterward.

Jeremiah Dowsing testified that some day or two after the murder, he heard some one at Noxubee turnpike about two o'clock at night calling out; from the voice he thought it was McCann; he did not see him; had known him before; said he wanted to buy corn and fodder for his horse; that he had been lost in the swamp; Noxubee turnpike is ten or twelve miles from Prairie hill.

Wiley Ross testified that during the second week of the Carroll circuit court, at Carrollton, he saw the prisoner; but did not recollect the day. Witness had business with Mr. Gilder; he

went into Judge Johnson's office and went up-stairs, and as he struck the landing, the prisoner rose up from a bed where he was lying behind Mr. Gilder; prisoner put his hand into his bosom and backed into a corner; witness saw the butt-end of a pistol in his bosom; Gilder said witness was no officer; witness had a paper in his hand for Mr. Gilder; witness asked what it meant, and Mr. Gilder said that old Mr. Toland had been killed, and McCann had left on account of it. In the mean time prisoner had returned to the bed and knelt down on it. Witness put his hand on McCann and told him, if he had killed Toland, he had better leave. He replied that he had not killed him, but was accused of it, and in proof that he had not killed him said, that Toland's children had given him money and weapons to leave, and promised to write to him. He further said that Mr. Toland had been found killed and nearly eaten up by the hogs; that it would be very hard for him to prove his innocence, as he was the last man seen by an overseer that night behind Toland, near Cross' lane, before Toland was killed. Witness told him he had better leave. Prisoner sold his horse in Carrollton. It was after twelve o'clock when witness first saw him, and the sun was about two hours high when he left on foot, with his saddle-bags on his arm, and took the road to Williams' Landing. It was agreed that the day when witness saw McCann, was Thursday, second week of Carroll circuit court, 1845.

Elijah W. Smith testified that he first saw the prisoner aboard the stage on the Jackson and Memphis road, in the county of Lafayette. Witness pursued and overtook him at the dinner-stand, eight miles from Oxford, towards Memphis. Witness went in, took hold of him, and arrested him for James McCann, when he replied that it was not his name, that he had never known anybody of that name, that his name was Wilson or some such name; that he did not wish to be detained; that he was on his way to Tennessee to see his relations. Witness searched his pockets and found receipts in the name of James McCann, and had the same name on his shirt; witness told him he would have to go back with him, and on their way back, three miles from Oxford, he acknowledged that his name was McCann; said he had heard Toland was killed, and that he did

not know he could prove himself clear.  At first he wanted to go back to Lowndes county; he was examined and committed to prison in Oxford.  When witness went to take him back to Columbus, he seemed to change his mind and wished to be tried in Oxford, stating as a reason why he did not want to go back, that it would be a damned long tedious case.  He requested witness to write to Frank Toland, or let him write.  When arrested, he had a pair of pistols (shown in court and identified by witness), and powder and ball.

Champion testified that he saw the prisoner in custody of Smith, when taking him back to Lowndes county, at Pontotoc; his cousin was with him, and knew McCann.  Witness spoke to prisoner, and told him they had him in a tight place. He replied that he thought not, and asked what people said about it.  Witness replied that they said he had killed Toland. Prisoner said he knew he was accused of it, and that was the reason why he left.  Witness' cousin remarked to prisoner that it was strange he left before he was accused; to which the prisoner made no reply.

L. W. Ward testified that he was one of the jury of inquest. He saw the body lying twenty-five or thirty feet from the road, head towards the road, the skirts of his coat in the rear of his head; the coat was a Kentucky jean one, with velvet collar. Witness was acquainted with deceased; he was fifty or sixty years old.  Witness didn't recollect seeing marks where the body was dragged; it was after twelve when he came to the ground.

James McGowan testified that he heard the report of the gun or pistol on the night of the killing; it was near a mile from where the body was found to his house; it was about three-quarters of an hour after daylight; he heard the report distinctly; it was nearly all prairie between where the body was found and witness' house; thought a gun could be heard distinctly that distance.  Witness was sitting on his portico at the time, and thought it was some one shooting turkeys.  He went on the ground about eleven o'clock, saw the mark on the tree where the ball struck; told some one to search about the root of the tree for the ball, and it was picked up by some one in witness' presence (a ball was shown in court which he

thinks the same); didn't recollect seeing McCann or Toland on the day of the death; he heard but the one report of a gun or pistol that night.

This was all the testimony on the part of the state.

For the defendant, —— Riddle testified that he was traveling with the prisoner the night of the killing, and saw no pistol or gun on him; did not see any weapon on him.

Henry N. Jones testified that he saw no pistol on the prisoner; was not close to him; he rode past witness; did not think of pistols; supposed he might have had pistols and witness did not see them.

Patrick McCann testified that he was the brother of prisoner; had seen one of the pistols shown him; gave it to the prisoner the day he started away; had it in his trunk four or five days before; got it from Frank Toland to give to Chandler; was at home the night of the murder; prisoner returned about half an hour after dark; didn't know that Frank Toland was at witness' father's house the day the body was found, but saw him riding by the field where witness was at work planting corn or plowing. Witness spoke to him, but held no conversation with him; it was about ten o'clock; prisoner was away from home with his father at the time; he started away from home two or three hours after witness saw Toland; witness went with him to go to Wallace's; prisoner said he was going away; they rode sometimes through the woods; he told witness he was going away because he was indicted for an assault with intent to kill, and he did not intend that they should make him give security; he did not say where he was going when they parted; be bade witness good-bye; he rode a chestnut-sorrel horse; he started from home the day of the killing, after breakfast, to go to town; witness' father was at home when prisoner and he left; Frank Toland and prisoner were very friendly, like most young men, and once went to South Carolina together. Witness was not intimate with Frank Toland, but was acquainted with old man Toland.

—— McCann testified that he was a brother of prisoner; was at home the night of the killing; prisoner returned home about half an hour in the night.

Walter Troup testified that he went to old Mr. McCann's the day the body was found; was within one hundred and fifty yards of the house, and saw a gentleman riding towards the house; it was about twelve o'clock; he had black clothes and a cap or low-crown hat on; he was afterwards satisfied it was Frank Toland. Witness was then talking with Patrick McCann, who was then plowing near the stable in the field. Witness' business was with old Mr. McCann, and Patrick told him he was not at home. Witness was not nearer than three hundred yards to the person who was so going to the house, and left before he got to it. He saw a gentleman sitting, at that time, in the passage, but did not know who it was.

This was all the testimony.

Numerous charges were asked and given on both sides, and are found in the record, but not embodied in the bill of exceptions, and are not considered by the court.

The jury found the prisoner guilty. His counsel moved for a new trial, assigning various grounds, which was overruled, exceptions taken, embodying the evidence as heretofore set out.

The prisoner then moved in arrest of judgment, because, 1st, The indictment was insufficient; and, 2d, Because there was a misjoinder of counts and alleged offenders; the motion was overruled, and the prisoner sentenced to be hung.

Sharkey, J. C., on McCann's application, ordered this writ of error.

CLAYTON, J.:

This was an indictment in the circuit court of Lowndes county for murder. The prisoner was convicted upon circumstantial evidence, and has brought his case to this court for revision.

There are but three acts of the circuit court complained of by bill of exceptions; one, the admission of certain testimony; the others, the refusal to give two charges asked by the counsel of the defendant. Upon these we shall remark in conclusion, and shall first consider the refusal to grant a new trial.

This point has been pressed with great earnestness, and it has been insisted with much zeal, that the verdict is without any suf-

ficient testimony.    The inconclusiveness of circumstantial proof, and the danger to be apprehended from convictions upon that species of evidence, have been dwelt upon with much force.

It is certainly true, that great care and caution should be used in the investigation of such testimony.    This is true also of every other kind.    All human testimony may be false.    Our own perceptions may be wrong; our own senses may deceive us.    Whilst this should teach us caution in the forming of our opinions and deliberations in adopting conclusions, it should not make us carry our doubts too far, because we should thereby be rendered unfit for all the practical duties of life.    Such is the state of things which surround us in life, that in all which concerns ourselves and our highest interests, we are compelled to act upon testimony, and often upon that testimony which circumstances afford.    The same rule is carried into judicial proceedings.    Circumstantial evidence has been received in every age of the common law, and it may rise so high in the scale of belief, as to generate full conviction.    When, after due caution, this result is reached, the law authorizes its ministers to act upon it.

After a careful review of the subject, Starkie lays down the only rule which can be regarded of practical application.  " What circumstances will amount to proof," he says, "can never be matter of general definition; the legal test is the sufficiency of the evidence to satisfy the understanding and conscience of the jury."  " On the one hand, absolute metaphysical and demonstrative certainty is not essential to proof by circumstances.    It is sufficient if they produce moral certainty, to the exclusion of every reasonable doubt; even direct and positive testimony does not afford grounds of belief of a higher and superior nature."  1 Stark., 577.

We shall proceed, in connection with this rule, to consider the evidence most material in this cause, without dwelling on some of the facts which have a more remote bearing.    It is in proof, that on the day of the murder the deceased went from his residence to the town of Columbus, a distance of twelve miles; that he rode a small horse, and from age stooped forward as he rode; that on his way home he crossed the ferry at Columbus, about an hour before sunset; that, in point of fact, he never reached

home alive, but his body was found the next day in a small clump of bushes, some thirty or forty feet from the road, and rather more than a mile from his house; there was a wound in the back of the neck, occasioned by a ball from a gun or pistol; there was powder in the inner surface of the wound, and the skin around it, as well as a straw or chip hat which he wore, were blackened with smoke and powder; the face, from the eyes down, had been eaten up by hogs, but no other part of the body had received much injury; the body had been dragged into the bushes thirty or forty feet from the road; there was an impression made by a ball upon a tree near the spot, some six feet from the ground, on the side next the road, and the ball was found at the foot, bruised and flattened; the skull above the eyes was sound, except that a part of the bone on the right side was detached; there was a saddle found on the spot, with blood upon the right stirrup leather; there were several traces of blood on the ground and the clothes; the murder was committed on a private road leading to the house of the deceased, a little distance from the public road; a report of a gun or pistol was heard by several of the neighbors, about half an hour or an hour after daylight down; the body was found about ten or eleven o'clock the next day; a jury of inquest was held, which terminated its sitting about ten o'clock at night, and up to that time no one was accused of the murder.

It was in proof, that the prisoner lived with his father near the deceased; that he also went to Columbus on the day of the murder, starting after the deceased did; that he was seen there on several occasions during the day, in company with J. F. Toland, a son of the deceased; that they spent a great part of the day together in a billiard room attached to a grocery, in which there was no other person at the time; that they were not engaged at play, but apparently upon business; that upon being invited to dinner, young Toland at first declined, saying that his father was in town, and that he did not wish to be seen by him, but that he afterwards consented to go.

That the prisoner crossed the ferry about two hours before sunset, consequently about an hour before the deceased; about sunset the prisoner overtook two witnesses, Sandifer and Riddle,

some five miles from Columbus, and rode with them three or four miles; he was riding a horse of good size; he conversed freely with the witnesses and told them his name; about seven miles from Columbus they overtook the deceased, who was riding very slowly in the rear of a wagon; at the house of Mills, near by, eight miles from Columbus, they got some water; a short distance from that point, the prisoner said he was going to Newsom's to get supper, and asked Riddle to go with him; Newsom lived about one hundred yards from the road, and there were thick woods between the road and his house; the witness did not go; McCann left them, but whether he went to Newsom's does not appear from the evidence; about a mile from Newsom's, near Gilmer's gate, a man passed these two witnesses at full gallop, whom they did not recognize, but who, from other testimony, is shown to have been J. F. Toland; after they passed Gilmer's gate, they were not overtaken by any other person; the road to the residence of old Mr. Toland leaves the Gilmer road a short distance beyond his gate; the murder was committed on this road, not very far from the Gilmer road, in a wood which extends from Gilmer's to the spot where the body was found; near this place there is a road leading from the Gilmer road to McCann's.

There is no direct trace of the prisoner, except in his own declaration, after he left Sandifer and Riddle, until he reached his father's house some half hour after dark, according to the testimony of his brother. The murder occurred near Cross' lane, one and a half miles from McCann's. Some ten, or twenty, or perhaps thirty minutes after the report of the gun or pistol, Lyon, who lived near the road leading from the Gilmer road to McCann's, heard a horse galloping, and observed that he left the road and took an unfrequented path, not likely to be known by any except those who lived near, leading through the woods in the direction to old Mr. McCann's. Nicholas Morgan makes the same statement, with the addition that he saw a rider on the horse.

The next day the body was found, and a jury of inquest held, as already stated. During the same morning J. F. Toland went to the house of old Mr. McCann. Towards two o'clock of the

same day, the prisoner was seen in company with his brother, some three or four miles from his house. They were riding rapidly through the woods, and prisoner appeared to be going off. His brother states, that he went with him several miles, and that they traveled sometimes in the road and sometimes in the woods; that the prisoner told him he was going away, because the grand jury had found a true bill against him, for an assault with intent to kill. A witness states, that a day or two after the murder, he heard some one at the Noxubee turnpike, about two o'clock at night, calling out, and from the voice thought it was McCann. He did not see him, but had known him before. He wanted to buy corn and fodder for his horse, and said he had been lost in the swamp. This was twelve or fifteen miles from the place of the murder. The next place he was seen, so far as the proof shows, was at Carrollton. He there exhibited great apprehension of being arrested. He told a witness that he had not killed old Mr. Toland, but he was accused of it; that the body had been found nearly eaten up by the hogs, and that it would be very hard for him to prove his innocence, as he was the last man seen by an overseer that night behind Toland, near Cross' lane, before Toland was killed. He also stated, that Toland's children had given him money and weapons to leave, and had promised to write to him. The same evening he left Carrollton on foot, having sold his horse. A few days afterwards he was arrested in the county of Lafayette, and voluntarily stated after his arrest, that he had heard that Toland had been killed, and that he did not know he could prove himself clear. Before his arrest he had denied his name, said that his name was Wilson, and that he was on his way to Tennessee, to see his relations. After his arrest, and whilst on his way to Columbus, a witness at Pontotoc remarked to him that he was in a tight place; he replied that he thought not. To another remark, he said he knew he was accused of killing Toland, and that was the reason he left.

There was no proof that the prisoner had any pistol or other arms on the day of the murder.

These are the most material facts to be gathered from the testimony on both sides. We shall proceed to consider their effect, in order to determine whether they sustain the verdict of the jury.

There is an absence of all effort on the part of the prisoner, to explain two circumstances in the early part of the transaction, which have some bearing in the case. The first is the failure to show where he was, from the time he crossed the river, until he overtook Sandifer and Riddle at sunset. The other is, that he did not show whether he went to Newsom's to supper, as he said he intended to do. These are considerations of great force against him. 1 Stark., 574, 575. They seem to indicate that he crossed the river before the decedent, so as to be sure that he should see him, and that having waited until he passed, he pursued his way homeward; that having overtaken the deceased upon the road, he again stopped, until he got in his rear, where he remained until the commission of the deed.

It is almost certain that the murder was committed with a pistol; the smoke and powder upon the surface and edges of the wound, and upon the hat, show that it was fired in immediate contact with the person. The blood upon the right stirrup-leather, which was the side next the woods, connected with the impression upon the tree, goes to show that he was shot upon his horse, and the range of the ball likewise shows that the person who fired was on horseback. The impression of the ball upon the side of the tree next the road, and the finding of the flattened ball at the foot of the tree, prove that the shot did not proceed from a person concealed in the woods. It is very certain that the ball could not have killed him, after it struck the tree and fell upon the ground. It is a fair conclusion, then, that the pistol was fired by some one on horseback in the road, very near to the decedent, who was higher than the deceased, bending forward on his small horse, and that the ball entered the neck, passed through the lower part of the head, and came out on the right side, detaching a portion of the bone, and having nearly spent its force, struck the tree, and fell at its foot. As it was after night, the murderer had to be near his victim to be sure of his aim. It will be remembered that the prisoner rode a good sized horse, and if he perpetrated the deed from his saddle, was elevated enough above the decedent to give the ball the direction it took. Soon after the report of the gun, the rapid galloping of a horse was heard, going from the direction

of the place of the murder towards the house of old Mr. McCann; a rider was seen upon him, and he took an unfrequented bypath through the woods, which led in a more direct course to the house than the road. It is not shown that any one else went to the house that night. The prisoner reached home, according to the testimony of his brother, about half an hour after dark, which was about the time of the report of the gun, according to the other witnesses. If there were any certainty as to the precise time of these several incidents, and the exact moment was fixed at which each took place, then it would be established that the prisoner was at home when the deed was committed. All experience, however, proves that but little reliance can be placed upon the recollection of witnesses, as to the exact moment of any occurrence. Men generally take so little note of the passing of time, that an approach to accuracy is all that can be expected. The killing took place about a mile and a half from McCann's. It is clear that but little time was spent at the spot by the murderer. The body was dragged a few paces from the road, and no attempt was made either to bury it, or carefully conceal it. The saddle and hat of the deceased were left where they fell. There was no appearance of the trampling of a horse, as if he had been tied and detained. It was the work of only a moment or two, followed by immediate flight, to avoid detection. A rapid gallop, such as Lyon and Morgan described, would have carried a person from the scene to McCanns' certainly in fifteen minutes. The early hour at which the prisoner reached home almost precludes the belief, that he stayed at Newsom's to supper, if indeed he went there at all.

These are the circumstances as developed up to the time of the killing, and however much they point to the guilt of the prisoner, they may leave room for a reasonable doubt. But the evidence does not close here. By far the strongest portion has been furnished by the conduct and declarations of the prisoner, subsequent to the deed.

There are no circumstances which require comment on the morning after the murder, until the interview with J. F. Toland. That interview appears to have prompted his immediate flight. He stated at Carrollton, that the children of Toland had fur-

nished him with money and weapons to leave. He saw none of the children, so far as the evidence discloses, except Frank. If he had no agency in the act, it is not at all probable, that he could have been bribed, or induced by Frank Toland, as has been argued, to fly before he was accused. A consciousness of innocence would have led him to abide the issue, and to see whether time would not disclose the real perpetrator. But he fled on the instant, and he must be content to bear whatever weight this circumstance furnishes against him. The consequences of his own act must fall on his own head. He was on his way before two o'clock of that day. The jury of inquest did not return their verdict until ten o'clock of that night, and up to that time, no whisper had been heard that he was accused or suspected. His fears induced flight before the voice of accusation was raised. The excuse, which he offered to his brother for leaving, was, that an indictment had been found against him and his father, for an assault and battery with intent to kill. But he had been the previous day to Columbus, the county town, and had not been disturbed. It does not appear that any process had issued upon the indictment, or that there was any necessity from that source for such sudden flight.

It was probably on the night of the same day, that he was at the Noxubee turnpike. He had been lost in the swamp, as he stated; for the reason, probably, that after parting with his brother, he still endeavored to make his way through the woods.

His conduct at Carrollton is not easy to reconcile with a belief of his innocence. He exhibited great fear of being arrested; put his hand upon his pistol, and threw himself into a defensive attitude, when a stranger entered the room in which he was. He then stated the fact of the killing, and of the finding of the body eaten up in part by the hogs, and said he had left, because he was the last person seen behind the old man, near Cross' lane, before he was killed, and that it would be hard for him to prove himself clear. This declaration is decisive of his fate. It brings him to the very theatre of the murder, at the time it was committed, and if he did not do the deed himself, it is almost certain, that he would have seen the person who did. He might then have saved himself by disclosing the real murderer. How

did he know that he was the last person seen behind the old man before he was killed, unless he was the real murderer himself? And this statement clears up all the doubt, which might otherwise have existed from the different opinions of the witnesses, as to the time of the act.

By his own confession he was not at home, but near Cross' lane, behind the old man, when drawing to the very scene of the murder. The declaration, thus made, to give an appearance of innocence to the circumstances of his flight, puts the seal of guilt upon his act.

In Lafayette county he denied his name, in order to elude arrest, but after he was apprehended, he voluntarily made the same explanation in substance which he had made at Carrollton. It was repeated at Pontotoc, and to a remark that it was strange he had fled before he was accused, he made no reply.

He has in this way furnished the most undeniable evidences of his guilt. If the jury has acted upon them, he has no human being to blame but himself, and his doom is upon his own head. They place his guilt beyond all reasonable doubt. They are entirely consistent with that conclusion, but utterly at war with all experience and with all our knowledge of the ordinary motives of human conduct, if we are to believe him innocent.

The case does not call for any elaborate attempt to define the limits of the power of this court in granting new trials in criminal cases, upon the testimony. Doubtless, it is a power which may be exercised where the jury has gone wide of the mark, and found a verdict against the decided preponderance of the testimony. But it is a power which should be exercised with great caution, because our constitution and laws have provided the trial by jury as the safeguard and protection of the lives and liberties of the citizen on the one hand, and of the safety and interests of the commonwealth on the other. It is placed by the constitution beyond the reach of legislative interference. This safeguard would be shorn of half its strength, if it might be withdrawn or disturbed by the courts, unless in a case of palpable error or of gross abuse. This is not a case of such a character. On the contrary, after carefully considering all the testimony, and listening to all which the ingenuity of counsel

could suggest, we are not at all prepared to say that, if we had been on the jury, we should have come to a different conclusion. To set the verdict aside under such circumstances, would be an unwarrantable invasion of their province.

There were but three exceptions taken during the progress of the trial. The first was to the admission of the testimony of John P. Krecker. This witness stated, that some eight or ten days before the murder he saw the prisoner and J. F. Toland in conversation on the Columbus bridge, some twenty or thirty feet within the bridge. Witness did not hear the conversation ; the prisoner had his back towards witness ; put his hand in his pocket, and when he saw witness looking at him, pulled some papers out of his pocket and put them in another pocket ; again put his hand into his pocket and pulled out something. J. F. Toland took something out of his pocket that looked like a powder-gourd, put it to his mouth, and pulled out the stopper, and poured something into prisoner's hand which he supposed to be powder. The part of the bridge on which they were was a retired place ; they remained about twenty or thirty minutes.

In cases depending upon circumstantial evidence, a number of links often occur in forming the chain. It cannot be said what bounds are to circumscribe the inquiry. All which may tend to elucidate the transaction, should be admitted. 1 Starkie's Ev., 561, *et seq.* The proof of the guilt of McCann, in some degree, depended upon establishing a combination between him and J. F. Toland. Apart from such combination, no motive is shown to have existed to lead to the perpetration of the crime. With such combination a motive is furnished, dark and hideous, it is true, and one which, for the honor of human nature, we should be glad to deem incredible, but which the records of crime show sometimes have found place in the bosom of the child, and have prompted to the murder of the parent. This circumstance, then, separated only by an interval of ten days from the fatal tragedy, might be an important aid in fixing the relation of the parties and in disclosing their real intentions and purposes. We cannot, therefore, say its admission was erroneous.

The other exceptions relate to the refusal of the court to give certain charges asked by the counsel of the prisoner. The first of these instructions was as follows : " That all the declarations of the prisoner brought out by the state are to be taken together, as well those in his favor as those against him, and that the portions favorable to him are to be regarded by the jury as being true, unless impossible in their nature or inconsistent with other evidence in the case." This was refused, and the following given in its place : " That in confessions by a prisoner all must be taken together, as well that which is in his favor as that which is against him, but that the jury are the sole judges of the truth of confessions, and can receive a part and reject a part." The instruction, as given, propounds the law correctly. A late writer on evidence thus lays down the rule: "If, what the prisoner said in his own favor is not contradicted by the evidence offered by the prosecution, nor improbable in itself, it will naturally be believed by the jury ; but they are not bound to give weight to it on that account, but are at liberty to judge of it like other evidence by all the circumstances of the case." 1 Greenl., 263, § 218. Roscoe says : " It must not be supposed that every part of a confession is entitled to equal credit. A jury may believe that which charges the prisoner, and reject that which is in his favor, if they see sufficient grounds for so doing." Crim. Ev., 51 ; 1 Stark. Ev., 283 ; Clewes' Case, 4 Car. & P., 221 ; 3 Phil. Ev., 927 ; Coon v. The State, ante, 246.

The remaining charge excepted to was as follows : " In criminal cases the mere union of a number of independent circumstances, each of which is inconclusive in its nature and tendency, cannot afford a just ground for conviction, unless the combination is conclusive." This was given in lieu of one asked by the counsel of the defendant, which laid down the converse of this proposition.

The instruction as given is not liable to objection. The union and concurrence of various detached circumstances may produce full conviction, when either one of them standing alone might leave room for much doubt. 1 Stark., 570.

An objection was taken to the indictment, that it charges the offense as at common law, whilst the punishment is inflicted

under the statute. This objection cannot prevail. Vance v. Commonwealth, 2 Virg. Cases, 162; ib., 378; White v. Commonwealth, 6 Bin., 179; Commonwealth v. Scarle, 2 ib., 339; Mitchell v. The State, 8 Yerg., 514.

These are all the points made in the argument which it is deemed necessary to notice. A careful examination of the testimony and of the points involved has disclosed to us no error in the proceedings of the court below. It only remains to say that the judgment is affirmed.

*Mr. Potter*, in behalf of the prisoner, filed a petition for a re-hearing upon the point, principally, of the error in the refusal of the instruction asked by the prisoner's counsel with reference to his confessions.

The re-hearing was refused and the prisoner sentenced to be hung.