BONE *v.* STATE.

In Banc. Dec. 31, 1949

No. 37513 (43 So. (2d) 571)

**E. C. Barlow,** for appellant.

**George H. Ethridge,** Assistant Attorney General, for appellee.

**Smith, J.**

Appellant was convicted of burglarizing the place of business of Hogue Lumber-Supply Company, a corporation in Carthage, Leake County, Mississippi, on August 13, 1948. He was by the court sentenced to a term of seven years in the State Penitentiary. He appealed here, and assigns many errors, which may be condensed: (1) overruling the demurrer to the indictment; (2) admission of testimony of certain officers on the allegation it was illegally obtained without search warrants; (3) permitting the reception into evidence of a blanket and a flashlight found in appellant's car; (4) admission of evidence of the two women; (5) granting certain instructions to the State; (6) overruling appellant's motion to exclude the State's evidence and peremptorily instruct the jury to find appellant not guilty, and overruling his motion for a new trial.

The appellant did not testify, and offered no testimony by other witnesses at the trial.

■■ The pertinent part of the indictment reads as follows: ''That Luther C. Bone in said county . . . did

then and there wilfully, feloniously and burglariously break and enter the storehouse of Hogue Lumber-Supply Company, a corporation organized and operating under the laws of the State of Mississippi, in which goods, merchandise, and other things of value were kept for sale, the property of said Hogue Lumber-Supply Company, with intent of him, the said Luther C. Bone then and there wilfully, feloniously and burglariously take, steal and carry away the sum of $10.00 in money, of the value of $10.00 in money, the property of said Hogue Lumber-Supply Company, found and kept for use and sale in said storehouse. . . ".

The indictment was drawn under Sec. 2043, Code 1942, as to which we said that the essentials to prove the crime of burglary are a breaking and entering the building and showing that it was done with intent to steal therein or to commit a felony. Gross v. State, 191 Miss. 383, 2 So. (2d) 818. Although we have declared that it is necessary also to allege the ownership of the building burglarized, James v. State, 77 Miss. 370, 26 So. 929, 78 Am. St. Rep. 527, we have further said that to prove occupancy satisfied this rule. Clinton v. State, 163 Miss. 435, 142 So. 17. So, in our opinion the indictment charges the crime of burglary, and the demurrer was properly overruled on this attack upon it.

The second ground of the demurrer, that the indictment does not "specifically charge that the Hogue Lumber-Supply Company is a domestic corporation", is refuted by a mere inspection of the indictment.

Complaint was also made that "The indictment does not charge or allege what kind of money was taken, whether the said money was in greenback bills, . . . . silver dollars . . . or . . . good and lawful money of the United States of America. . . . " Since the charge is burglary, we do not agree that the indictment is demurrable on the ground stated. We are not, however, adjudicating one way or another the crime of lar-

ceny in the case at bar. By way of illustration, we recall the case where an indictment charged a breaking and entering of house with intent to steal therein, accused was not prejudiced by an amendment to conform to the proof, substituting for the charge that a vending machine of stipulated value was stolen that a slot machine containing money was stolen, since indictment was sufficient to support conviction for burglary without allegations as to the property actually stolen, and such allegations should be treated as surplusage. Hawkins v. State, 193 Miss. 586, 10 So. (2d) 678.

The demurrer to the indictment was properly overruled, and we refrain from further discussion of that assignment of error.

This brings us to consideration of the question, whether or not the trial court erred in refusing a peremptory instruction to appellant, and overruling his motion for a new trial, based on such refusal and because, as contended by appellant, the verdict of the jury was against the overwhelming weight of the evidence. This requires a review of the evidence.

The victim of the burglary was a dealer in builders' supplies in Carthage at the time of its occurrence, and was a Mississippi corporation. The crime was discovered at 6 o'clock on the morning of August 13, 1949, upon its place being opened for business. The books were thrown on the floor and a safe door was blown off the hinges; the back door of the store building which did not face any street, was standing ajar about two inches. It had been chiselled open and the night latch broken off. $6.38 was missing from the safe. The sheriff was notified, and after arrival at the store, called the highway patrol, giving a tag number.

The condition of the store safe was described by the sheriff as follows: "The door was torn up and a piece of sheet metal and the packing put in there to resist heat, a lot of that was on the floor. Inside the door was

a mesh wire like chicken wire and the ends of that were protruding out—where this inside piece of iron was screened on the back to hold this fire resistance, and the jagged ends stuck out of that door.'' The significance of the ''packing'', otherwise called ''filler'', and of the ''jagged ends'' of the wire, and their importance, will appear as the facts are further developed.

When the sheriff had testified: ''Mr. Hogue and I come up to where I had seen a strange car that night,'' the appellant asked that the jury retire and ''this part of the evidence'' be heard out of the jury's hearing, which was done. The objection then made involved assignment of error Nos. 2 and 3, based upon the fact that the sheriff had no search warrant, and hence what he learned from the car was inadmissible. The trial court, we think, properly overruled the objection. The sheriff never opened the doors of the car or trunk, or searched them, what he learned was entirely and exclusively by the eye. In making this ruling, the trial court said: ''I don't think this is a search of an automobile. The evidence shows that there had been a number of burglaries about the town of Carthage. The sheriff was informed that there was a strange automobile parked down here in 250 yards of the place where subsequently developed that Hogue Lumber-Supply Company was burglarized. The evidence shows that the hood had been raised; that it was a two-tone Cadillac car. It was a strange automobile. They had never seen a car like that in this community. I think that in the discharge of an officer's duty that was sufficient for the officer to, at least determine what the tag number was when he didn't have to do anything but look at it. He observed a peculiar blanket, as he described, in the automobile. It doesn't appear that he made any search. It was standing out there in the street. The eye doesn't trespass.'' We quote the court's ruling, because it reveals sufficiently those things objectionable to appellant in the sheriff's testimony, and aids in the

correct disposition, at least in part, of other assignments of errors as will later appear. ■ As stated, we think the trial judge was correct. "The eye doesn't trespass." It is to be remembered that the officer did not open the doors of the car or its trunk, or make a search of either. It has been specifically held by this Court that obtaining information by means of the eye, where no trespass has been committed in aid thereof does not constitute unlawful search. Constitution 1890, Section 23; Goodman v. State, 158 Miss. 269, 130 So. 285. That is still the law in Mississippi, and hence the evidence of the sheriff, which, as will be set out in more detail *post,* was admissible even though he had no search warrant. The incidents in connection with this car, to which reference is at this time made, occurred the night of the burglary.

Upon the return of the jury, the sheriff testified before it, in substance, as follows here. He saw a strange car after 2:00 a. m. the night of the burglary on Jordan Street in Carthage, where there was only one house facing the street, from which the car was parked about seventy-five yards, and approximately two hundred and fifty yards from Hogue Lumber-Supply Company's store, which was burglarized. The car was a two-toned Cadillac, 1942 model, Tag No. 340-118. He, in company with Town Marshal Brooks, had seen the same car there, but on that visit he merely noted the tag number was from Jones County, and left to make a call, but, being suspicious, later returned alone and made the observation detailed in the opening part of this paragraph. He also stated that he saw that the seat covers were badly worn and torn, and on one of the seats there was a fringed blanket, of a "greenish" color, with big white checks. He did not see the car any more that night, August 13, 1948, the date of the burglary.

However, he did again see it about 3:30 p. m. of the afternoon of that same day in Hattiesburg, in the garage

of the Ford Motor Company, where it had been placed by the police. It bore the same tag number 340-118 and had the same blanket in it. It was the same car. He also saw appellant in Hattiesburg in jail, who claimed the car had never left Hattiesburg, nor had he, the day and night of burglary. This was a significant circumstance itself, since the falsity of appellant's claim was so abundantly proven. The tag number had been issued to one Steadman, but Bone had it because of a debt due him by Steadman, having taken it as payment. Bone further stated the car was at his place of business, "The Supper Club", near Hattiesburg all that night. On cross-examination, the sheriff conceded he did not see appellant at Carthage and had no direct personal knowledge of who actually committed the burglary. However, he said he did see tracks going into and coming out of the vacant lot by which the car was parked, leading from and to it. It was shown subsequently by another witness that the back end of the burglarized store abutted upon this vacant lot.

Nevertheless, while no one actually testified to having seen appellant commit the burglary, or in Carthage that night, it is clear that his car was proven to have been there then. █ Furthermore, two sisters placed him personally within seventeen miles of Carthage that same night, Mrs. Elaine Barnett and Miss Ouida Barnett. Their testimony was first heard in the absence of the jury, and thereafter admitted in the presence of the jury, over appellant's objections, which were without merit.

Mrs. Elaine Barnett operated a cafe on Highway 35 known as "35 Drive In," which highway runs through Carthage near the city limits. Between 12:00 and 1 o'clock of the burglary night, she saw appellant at her place of business, with a younger man. She heard about the burglary the next day. Appellant had driven up from the direction of Kosciusko, parked in front of the cafe, and stayed about fifteen or twenty minutes drink-

ing coffee. His car was a two-toned Cadillac with a Jones County tag. Four days later appellant was brought back there by Sheriff Mundy and some patrolmen for purposes of identification. This was the same man with the same car. Carthage was seventeen miles from the cafe of this witness. On cross-examination, Mrs. Barnett said the witness smiled twice, revealing his gold teeth, and she could see the car plainly outside because the cafe had a glass front, and the area was brightly lighted. Her sister-in-law corroborated Mrs. Barnett.

The car, it will be recalled, was first noticed by Carthage City Marshal and Deputy Sheriff McGivney late the night of the burglary, with its hood raised. Although without a search warrant, they opened the car doors and searched it, before they called Sheriff Mundy. They were properly not permitted to testify as to the contents of the car, but were correctly permitted to state that it was a two-toned Cadillac, with Jones County, Mississippi Tag No. 340-118. They both saw the same car at Hattiesburg the next day.

The discovery of the owner of the car and its location was due to the alertness of Highway Patrolman Anderson, who obtained information on the radio in his patrol car that both were wanted. He personally knew that the described car, with its designated and numbered tag, was a Cadillac belonging to appellant. He, therefore, broadcast from his cruiser the desired information, which led to appellant's arrest and the discovery of the car parked behind a cabin behind appellant's "Supper Club."

This message on the air was received by Hattiesburg policeman McVay, who, in company with several other officers, repaired to appellant's "Supper Club," where they found the two-toned Cadillac car, with Jones County Tag No. 340-118, parked as aforesaid. The officers entered the cabin, after appellant opened the door, finding him, in his underclothes, and a woman, in the bed. He was placed under arrest, protesting his innocence, and

also expressly consenting to a search of his car, which was then and there made.

As a result of the search, the officers found a new handsaw wrapped, a brace and bit, chisels and wrenches, and a rag having the appearance of having been used to wipe off fingerprints. The latter opinion of the witness was asked and admitted without objection. Appellant further claimed an alibi for both himself and car, when arrested, asserting that neither had been out of Hattiesburg the night of the burglary at Carthage. But at the trial, he offered no evidence in support thereof, not even the woman found in his bed at the time of his arrest. The blanket already described, supra, was also found in the car. Both appellant and his car were recovered by the officers. These officers had no warrant to search the car, but as stated, searched it with appellant's express permission, and, therefore, needed none. This witness was fully corroborated by the other officers present.

Deputy Sheriff McGivney was then recalled and testified that he drove the car back from Hattiesburg to Carthage, the day after the burglary, after it was located, the car containing the described blanket and a flashlight, the latter being placed in the glove compartment of the car by the witness, who then stored the car in a garage for three or four days.

The safe of Hogue had two doors on it, one had been blown off, and the jagged wire of which he testified was in front of where the two doors came together. The protruding ends were sticking out and the sheet inside had been loosened. The door was metal but was packed inside with an insulating filler. The pertinency of this evidence will appear more fully from the testimony of two technicians introduced by the State.

The first of them was Mr. Mike Nichols, who was a graduate of the Federal Bureau of Investigation, was employed at the time of these events in the Identification Office of the Mississippi Highway Patrol, and formerly

with the same bureau of the Meridian Police Department, and on the detective force of that city. He made an investigation of the burglary and of the safe, its filler and the reenforcement of the latter by wire. There was an opening through this filler of approximately four inches in area, and a good bit of the filler had been knocked out of both doors. The opening was large enough for an ordinary man to put his arm through. This witness described the filler as having "small sharp particles that looked like glass and sand in it." A specimen of it was taken by him to his Jackson Headquarters. On the night of August 14th (the burglary having occurred during the night of the 13th) he lifted a small bit of this filler from the right forearm of appellant, at least a particle similar to it, which was let in without objection. At the same time, he observed twenty cuts or scratches on appellant's forearm, anywhere from tiny scratches to one and a half inches long. Most of them were crosswise of the arm. The small particle taken by the use of a knife blade from appellant's arm was preserved in a small medicine powder box.

The testimony of Mr. Nichols was also to the effect that he obtained the flashlight from the glove compartment of appellant's car, where Deputy Sheriff McGivney testified he had placed it. A substance similar to the safe filler was on the butt end of the flashlight. These things were turned over to Mr. Ed Blue, the Director of the State Bureau of Identification, who also testified in the case. Mr. Nichols was not a chemist and had never studied medicine or surgery. He said the cuts on arm would have gone lengthwise or across, depending on what a man was doing with his arm; his testimony was not that all were crosswise, but merely that most were.

Mr. Ed Blue was thereupon introduced as a witness on behalf of the State. He had attended schools of the Federal Bureau of Identification and served three years with that organization. He prepared the evidence and sent

it to Washington. He also visited the scene of the burglary and made his own inspection of the safe, where he also secured specimens of the filler, which he likewise sent to Washington. Later, these items were all returned to him in a package unopened until the morning of the trial. He compared the specimens of the filler taken from the safe with the particles on the flashlight and they were similar.

Roy H. Jevons of Washington testified that "I work in the F. B. I. Laboratory in Washington, D. C., and my main job is to analyze physical evidence that comes in criminal cases," in which type of work he had had nine years' experience, and four years' training in the School of Mines of the University of Idaho, with the degree of Bachelor of Science in Geology. He received the package sent by the Mississippi Highway Patrol containing the flashlight and a known sample of the safe insulation. He testified: "I examined the flashlight which was submitted and found on the knurled end, this end here, a quantity of material which I determined similar to the known specimen, the usual portland cement and vermiculite mica. This is a special mica used for insulation purposes, which is composed of deatonna, cevrons and dim earth which is an earth material composed of small plant life settling to the bottom or in the bottom of the ocean forming dim earth; it is composed of three different substances. The specimen on the flashlight was composed of the three small substances as the known insulation from the safe door, and it is my opinion that the insulation on the flashlight is the same type as that from the safe door." This examination was made principally with the aid of a microscope, and, in part, chemically,— the usual and commonly accepted method in that field of science.

By adroit cross-examination, appellant sought to show that, perhaps in handling or shipping the filler, it could have become attached to the flashlight, but this was met

by the full explanation of the Federal Bureau of Investigation's complete and experienced manner of handling the various articles involved to avoid such a contingency, and that it could not have occurred.

When the State rested its case, the appellant made a motion to exclude all of the testimony, and also moved for a directed verdict of acquittal, and upon the overruling of those motions, he moved for a new trial, and this likewise was overruled. His contention here is that since there were no search warrants, the evidence produced from defendant's car was incompetent, but since it has been shown that the car was never searched by the sheriff, who used only his eyes, without committing any trespass; and the officers who arrested appellant searched his car with his express consent, this view is not well taken. Therefore, the cases cited in his brief as to search warrants are not in point.

It is further argued by appellant that the evidence, being merely circumstantial, does not convict appellant beyond every reasonable doubt, and to the exclusion of every other reasonable hypothesis. Cases are cited. Reliance especially is had upon this in Sorrells v. State, 130 Miss. 300, 94 So. 209, "It (the evidence) is always insufficient where, assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true, for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of truth. Whenever, therefore, the evidence leaves it indifferent, which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence cannot amount to proof, however great the probability may be." This was a quotation from Algheri v. State, 25 Miss. 584.

An hypothesis may be defined as a real condition taken as a basis for inference or ground from which to draw conclusions. The appellant was granted ▮ several in-

structions to the jury that before appellant could be found guilty of the charge against him, the minds of the jury must be satisfied of his guilt beyond every reasonable doubt, and to the exclusion of every hypothesis. These instructions, however, omitted the qualifying word, "reasonable," which should have modified "hypothesis"; but assuming it to have been where it should, this issue was, therefore, submitted to the jury for decision. The omission of the word "reasonable" was more favorable to appellant than is the applicable law, and he suffered nothing thereby. An instruction granted the State correctly charged the jury "that the crime here charged may be proven by circumstances, and it is not necessary to have an eyewitness to the deed if the circumstances in evidence are sufficient to create in the minds of the jury a belief that the accused party is guilty beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis than that of guilt of the accused." The verdict of the jury was their certificate that their minds were satisfied of appellant's guilt from the circumstances beyond all reasonable doubt, and to the exclusion of every other reasonable hypothesis than that of guilt. Indeed, no other reasonable hypothesis can be drawn from the record in this case.

We have said: "Such is the state of things, which surround us in life, that in all which concerns ourselves and our highest interests, we are compelled to act upon testimony, and often upon that testimony which circumstances afford. The same rule is carried into judicial proceedings. Circumstantial evidence has been received in every age of the common law, and it may rise so high in the scale of belief as to generate full conviction. When after due caution this result is reached, the law authorizes its ministers to act upon it." McCann v. State, 13 Smedes & M. 471.

In Johnson v. State, 23 So. (2d) 499, we held that the sufficiency of circumstantial evidence in criminal cases

is peculiarly for the jury's determination, and that, therefore, a verdict founded upon circumstantial evidence will be permitted to stand unless it is opposed to the decided preponderance of the evidence or based on no evidence; and furthermore that the power of circumstances to satisfy the minds of the jury beyond reasonable doubt of guilt and to the exclusion of every other reasonable hypothesis consistent with innocence is the test of sufficiency of circumstantial evidence to convict. Applying such test here, the evidence must be adjudged to be sufficient, and the court properly overruled appellant's motion for its exclusion, a peremptory instruction, and a new trial.

■ Appellant objects to three instructions granted the State, which omit the phrase, "and to the exclusion of every other reasonable hypothesis than that of guilt," because of such omission. Standing alone these instructions would be erroneous, but when read together with all of the other instructions, both those of the State and appellant, the error is harmless. It has been shown, supra, that this point was fully covered by other instructions granted both sides at the trial.

We do not deem other points raised by appellant to be of sufficient merit to justify discussion.

We have carefully given our attention to this case, and the errors assigned, find no merit in the assignments, and affirm the judgment of the trial court.

Affirmed.