SAUER *v.* STATE.

(Division B. Nov. 7, 1932. Suggestion of Error Overruled Jan. 2, 1933.)

[144 So. 225. No. 29983.]

**A. A. Cohn,** of Brookhaven, and **Means Johnston,** of Greenwood, for appellant.

510

512

**W. D. Conn, Jr.,** Assistant Attorney-General, for the state.

Argued orally by **Means Johnston** and **A. A. Cohn**, for appellant, and by **W. D. Conn, Jr.**, for the state.

**Ethridge, P. J.**, delivered the opinion of the court.

The appellant, Mrs. Myrtle Love Sauer, was indicted jointly with one Ralph Greenlee, and convicted on a charge of assault and battery with intent to kill and murder her husband, A. D. Sauer, in the circuit court of Lincoln county, and has appealed to this court.

The indictment, omitting the formal part, charges that "Myrtle Love Sauer and Ralph Greenlee, late of the County aforesaid, on the 4th day of January, A. D. 1932, in the county aforesaid, did then and there unlawfully, wilfully, feloniously and of their malice aforethought assault one A. D. Sauer, a human being, with a deadly weapon, to-wit; a large piece of iron, and then and there unlawfully, wilfully, feloniously, and of their malice aforethought, strike and wound said A. D. Sauer, with said large piece of iron, a deadly weapon, as aforesaid, with the felonious intent and of their malice aforethought to kill and murder the said A. D. Sauer."

This indictment was demurred to on the following grounds:

"First. The indictment fails to charge the commission of any crime under the laws of the state of Mississippi.

"Second. The indictment fails to charge that the de-

fendant struck the said A. D. Sauer with a large piece of iron.

"Third. The indictment fails to charge that the defendant struck the said A. D. Sauer with a felonious intent and of her malice aforethought to kill and murder the said A. D. Sauer.

"Fourth. The indictment fails to charge that at the time the said A. D. Sauer was struck with a large piece of iron, there was a felonious intent to kill and murder him with malice aforethought.

"Fifth. The indictment fails to charge the place where the defendant struck the said A. D. Sauer with the felonious intent to kill and murder the said A. D. Sauer with malice aforethought."

The demurrer was overruled, and the state moved to amend the indictment by inserting the word "did" between the words "aforethought" and "strike," making the indictment after the amendment, to read "then and there, unlawfully, wilfully, feloniously and of their malice aforethought, did strike and wound said A. D. Sauer, with said large piece of iron, a deadly weapon, as aforesaid, with the felonious intent and of their malice aforethought, to kill and murder the said A. D. Sauer."

The appellant moved for a severance, which was granted, and she was placed on trial and there was a mistrial, whereupon, at the same term of court, she was again placed on trial and convicted and sentenced to three years' imprisonment in the state penitentiary, from which she has appealed to this court, as stated hereinbefore.

The evidence is largely circumstantial, and without going into details, it is sufficient to say that Mr. Sauer, the person assaulted was a civil engineer for a railroad, and, in addition to this employment, operated a photograph business at his residence, having a development room in the back yard adjacent to his residence, and using some rooms in the house as guest rooms, where

pictures were taken, and then were developed in the laboratory or developing room in the back yard. On the evening of December 29, 1931, A. D. Sauer, the assaulted, after eating supper had gone to his laboratory or developing room to work on some photographs. He turned out the light in this laboratory and started to the house, having in his hand a part of the material he was working upon. He was struck on the back of his head, and "hollered" for help, and was struck again. He testified that he remembers nothing else until several days thereafter, and does not now know who struck him.

Adjoining his residence is an apartment house occupied by Mr. and Mrs. Penn, a Mrs. Myers, and others. About the time Mr. Sauer says he was struck, Mrs. Myers, who occupied the lower apartment, heard a call for help repeated several times; the voice growing fainter each time. She looked out, but saw no one, and she then went upstairs to where Mr. and Mrs. Penn were and reported the facts to them. Mr. Penn then took a flashlight and searched around his own premises, but saw nothing thereon. Mrs. Myers and Mrs. Penn went on a back porch on the Penn apartment, at which time they saw Mrs. Sauer come out of her house, go nearly to the garage, and then return to the house, cutting off the light on the back porch which she had turned on when starting to the garage. She remained in the house two or three minutes, then came out, went to the garage, and presently Mrs. Sauer's car was backed out without the lights being turned on, into Highway No. 51, upon which the Sauer residence is situated. As the car was backed out of the Sauer premises into the highway, a lady living almost opposite the Penn residence had started to visit a neighbor, and saw the Sauer car backed into the highway with Mrs. Sauer driving it.

Another lady who was living in the Sauer home, and who was leaving her work to go to said house, saw said car proceeding along Highway 51, driven by Mrs. Sauer.

The car was a peculiar color, lavender, with some advertising matter upon it.

Near where this lady saw Mrs. Sauer driving the car, and not far from the place where it was afterwards found, is a cut near a bridge over a railroad track. A Mr. Case and his son saw this car, driven by a lady, and they saw this last lady witness who testified, at or near the place they met this car. They did not identify who was driving the car, but said it was a lady, and they did not see any other person in the car.

A man, who was working near the place where the car was afterwards found, was going from his work early in the evening, shortly after six-thirty p. m., and approached the bridge where the car was driven off the dump into the cut, testified, to seeing a light burning brightly in the cut, and that he thought some one had set fire to the bridge; it having been set fire to previously. As he approached the bridge, he saw it was not a fire, but apparently a car; consequently he was proceeding to the store of Mr. Smith to get Mr. Smith to go with him to where the car was, in which Mr. Sauer was insensible. As he was proceeding towards this store, he saw a woman (who was Mrs. Sauer) in the road, and it being dark, he asked her who she was; she stated she did not know; he asked her was she hurt, and she stated that she did not know. He then asked her if she was white or colored, to which she replied, "White." This man had a negro with him, and stated that they would go on to the Smith store and get Mr. Smith to help with the car. Then, the appellant, Mrs. Sauer, asked him to carry her with him to the Smith store, and he says he at first declined, but afterwards agreed to, and did, take her to the store, where she appeared to be unconscious. She had a bruise on the front part of her face and head, and Mrs. Smith proceeded to minister to her. She also had a bruise on one knee, and appeared to Mrs. Smith to be unconscious. Mrs. Smith rubbed the

bruised places with Vick's Salve, and started to feel her heart, and feeling something in her bosom, started to take the package out, when Mrs. Sauer apparently aroused and said, "That is mine."

The man who is mentioned as discovering Mrs. Sauer, went back to where the car was found in the cut with the lights on, and he testified that he found Mr. Sauer in the car, unconscious, with some wounds on his head. The rear wheels of the car were upon the railroad track, and the front wheels upon the embankment. There was blood on the seat where Mr. Sauer was, and blood on the back of the driver's seat. The witness spoke of the turtle shell having blood on it, and that it was large enough to hold two people, but had no seat in it, being used for baggage.

When Mr. Sauer was carried to the Smith store, an ambulance was sent for, and Mr. Sauer and appellant were carried to the hospital in Brookhaven, some five miles away, where Mr. Sauer remained unconscious for about a week. He had several wounds in his head, and cuts in the fleshy parts of his head, but his skull was not fractured. After he was carried to the hospital, a lady who lived in the Sauer house visited Mr. and Mrs. Sauer there after learning of their wreck, and Mrs. Sauer gave to this lady the package she had in her bosom at the time of the wreck, and which was a sum of money in an envelope being one hundred and twenty dollars.

It appeared that prior to the assault, Mr. Sauer had withdrawn one thousand dollars from the bank and had given it to his wife to keep for the purpose of paying some taxes. It had not been used or returned to him at the time he was assaulted. It was shown that some time before the assault, Mrs. Sauer and her small children, accompanied by Mr. Greenlee, visited her relatives in Paris, Tennessee. Mr. Greenlee remained there a day or two, and then went to Memphis, Tennessee; then re-

turned to Paris, Tennessee, and stayed with Mrs. Sauer's relatives, until they started back to Brookhaven. En route, they spent the night in Memphis. Mrs. Sauer testified that she did not know whether Mr. Greenlee stayed in the hotel where she stayed or not, but that they attended the theater, and left the oldest child there, she, Mr. Greenlee, and the baby returning to the hotel, and later going for the oldest child, a girl of eleven or twelve.

Subsequent to that time, and not long before the assault on Mr. Sauer, Mrs. Sauer had been seen in the car with Greenlee; she having picked him up on a number of occasions and driven him about town.

A lady living in the Sauer home testified that on the morning before the assault Greenlee had called Mrs. Sauer over the phone, and requested her to meet him downtown, which she did.

Later in the day, about one hour before the assault, several witnesses saw Mrs. Sauer driving along, pick Greenlee up, and drive with him into some garage, where they had a conversation which was not heard by the witnesses.

Mrs. Sauer was also shown to have met Greenlee a few days before the assault, buying a Christmas present for him:

It was also testified by a lady living in the Sauer home that during the Christmas holidays Mrs. Sauer came in her room (Mrs. Sauer having been down in Brookhaven) and asked this lady to state to Mr. Sauer that she (Mrs. Sauer) had been in the witness' room all the while, which the witness declined to do.

It was also offered in evidence, over the objection of the appellant, that Mr. Sauer had about twenty-five thousand dollars insurance upon his life, and about nine thousand dollars accident insurance. The proof did not show, however, to whom this insurance was payable.

Mrs. Sauer stated the next day, in explaining the accident, that Mr. Sauer was driving the car, going too

fast; that he was noted for going on the wrong side of the road, and while she was with him in the car, he driving, she saw the approach to the bridge and the danger, and that she had taken the one hundred twenty dollars from her purse and placed it in her bosom because she thought a wreck was likely, and that persons picking them up would do so the more readily, seeing they had money; that she had jumped from the car, and that the bruises on her face were caused by her exit from the car.

A witness, visiting Mrs. Sauer the next day after she had been moved from the hospital, observed that she did not seem to be disturbed about Mr. Sauer, and spoke to her about it; and Mrs. Sauer's mother stated at the time that Mrs. Sauer did not seem to care anything about Mr. Sauer.

Mrs. Sauer testified, stating that she was in her home with her mother, and children, playing with her baby, dancing, etc.; she was accustomed to go each day about five-thirty for the mail, so she stated to her mother that she would take the baby, get Mr. Sauer, and go for the mail; her mother said that the baby was not dressed, and was playing, and for her to leave the baby with her; whereupon Mrs. Sauer went out of the house to get the car and go for the mail, but when she neared the garage she found she had dropped something, and returned to the house to get her gloves or whatever it was that she had dropped, after which she returned to the garage to get the car; that as she was getting into the car she was struck a blow which rendered her unconscious, so that she did not see who her assailant was, nor did she remember anything until she was in the Smith store, and only faintly remembered what happened there, though she did remember some remarks made at that place; that she did not know anything about Mr. Sauer being struck, and did not participate in it.

The appellant complains seriously of the amendment to the indictment, as above set out. This indictment is

under section 787, Code of 1930, which reads as follows: "Every person who shall be convicted of shooting at another, or of attempting to discharge any firearms or air-guns at another, wilfully; or of any assault or assault and battery upon another with any deadly weapons or other means or force likely to produce death, with intent to kill and murder or to maim, ravish, or rob such other person; or in the attempt to commit any murder, rape, manslaughter, burglary, larceny, or other felony; or in resisting the execution of any legal process, or any officer or private person lawfully attempting to arrest him or any other person—shall be imprisoned in the penitentiary not more than ten years, or shall be punished by a fine of not more than one thousand dollars, or by imprisonment in the county jail not more than one year or by both."

It is admitted in the argument that an indictment of general assault with intent to kill and murder is sufficient; but it is contended that an assault with intent to kill and murder is a different offense from an assault *and battery* with intent to kill and murder; and that the appellant was indicted for, and convicted of, assault and battery with intent to kill and murder; and that the addition of the word "did" in the original indictment, which was inserted by amendment, rendered the indictment void and of no effect.

The statute, in the same section, denounces a number of things, with the same punishment for each. It would, in our view, be immaterial for the indictment to state that the crime was assault *and battery,* etc., as the indictment clearly charged an assault with intent to kill and murder. To the like effect are the cases of Jimerson v. State, 93 Miss. 685, 46 So. 948, where the court said that an indictment charging that defendant willfully, etc., *assaulted* a person with a deadly weapon with intent to kill and murder, was not objectionable as being duplicitous in charging an attempt to commit an assault and bat-

tery, etc., since, if they be regarded as two offenses in the abstract, they are so associated, and punishable, as to authorize their joinder in the same indictment; Roberts v. State, 55 Miss. 421; Wash. v. State, 14 Smedes & M. 120; Sarah v. State, 28 Miss. 267, 61 Am. Dec. 544; Brady v. State, 128 Miss. 575, 91 So. 277.

The rule is that where the statute charges a number of different things in the same section, punishable by the same penalty, it will be permissible for the indictment to charge any or all in the same count, by using the word "and" between each charge; and if the evidence sustains one of them, and conviction is had on one, it constitutes res adjudicata against an indictment for any offense subsequently found and charged in the first indictment.

If the contention of the appellant is sound as to the insufficiency of the charge, it nevertheless charges assault with intent to kill and murder, and a charge of assault is a part of a charge of assault and battery. There can be no assault and battery without assault, and as the same penalty is imposed for an assault with intent to kill and murder, as for an assault and battery with intent to kill and murder growing out of the same transaction between the same parties, an indictment charging a general assault with intent would be sufficient to sustain a conviction.

We are, therefore, of opinion that there was no reversible error in permitting the amendment to the indictment.

As to the objections to the evidence, we think, as the case was largely controlled by circumstantial evidence, that any circumstances logically tending to show a motive on the part of appellant to commit the crime were admissible in evidence. All of the facts stated above have a tendency to prove a motive on the part of the appellant, and to connect her with such motive for the commission of the crime. Circumstances which in and of themselves would have but slight weight, and would

be insufficient, standing alone, to furnish a motive, when taken in connection with other circumstances having a like tendency and logical relation, might furnish a strong and convincing proof of the fact sought to be established.

We think the evidence is sufficient to warrant the jury in finding the appellant guilty. It was for the jury to pass upon the credibility and weight of the evidence, and taking all the facts proven in connection with the statements that the appellant testified to, we think a case was made out by the evidence. Appellant's first statements showed that her testimony on the witness stand was untrue, if the jury believed the first statements. It is admitted that Mrs. Sauer drove the car at the time it was wrecked. Mr. Sauer was incapable of driving the car at the time, and there is no evidence to show that he was driving it, except the first statements made by the appellant shortly after the accident, which are shown to be absolutely untrue.

The court gave the appellant very liberal instructions, fully announcing the law favorable to her, and we think the appellant received the benefit of every principle of law to which she was entitled under the evidence.

Instruction Number 1 for the state, complained of by the appellant, reads as follows: "The court instructs the jury for the state, that you do not have to know that the defendant, Mrs. Sauer, is guilty before you can convict her, but that in order for you to be warranted in returning a verdict of guilty as charged in the indictment, it is only necessary that you believe from all the evidence and facts and circumstances in evidence, beyond all reasonable doubt, and to the exclusion of every other reasonable hypothesis, that the defendant is guilty."

It is always true that the jury are not required to know facts absolutely. They must believe from the evidence, and their belief must arise from evidence, or the want of evidence, and the jury must not use anything except that which is offered in evidence. The latter part of the

instruction clearly informed the jury that they are only required to believe, from the evidence, beyond all reasonable doubt, and to the exclusion of every other reasonable hypothesis, that the defendant was guilty.

Applying the rule as to the sufficiency of circumstantial evidence, it must be a reasonable hypothesis. Circumstantial evidence does not have to exclude every possible doubt, but only every reasonable doubt, or reasonable hypothesis. To exclude every reasonable hypothesis is a somewhat stronger expression than excluding every reasonable doubt.

We find no reversible error in the conviction, and the judgment of the court below must be affirmed.

Affirmed.