# DICKINS *v.* STATE.

In Banc. Dec. 12, 1949.

No. 37490 (43 So. (2d) 366)

70

W. D. Conn, Jr., and B. B. Wilkes, for appellant.

J. T. Patterson, Assistant Attorney General, and Stanny Sanders, District Attorney, and Willard L. McIlwain, County Attorney, for appellee.

Montgomery, J.

The appellant, Mrs. Ruth Thompson Dickins, was indicted by the Grand Jury of Washington County for the murder of her mother, Mrs. Idella Long Thompson, and was found guilty of the charge by the jury, which was unable to agree upon the punishment, and she was by the Court sentenced to a life term in the penitentiary.

Mrs. Thompson lived on Deer Creek Drive in the City of Leland, and her daughter, Mrs. Dickins, the appellant, lived on the same street with only two houses between the home of Mrs. Thompson and the home of Mrs. Dickins.

On the afternoon of November 17, 1948, Dr. K. L. Witte received a telephone call at his clinic in Leland from Mrs. Dickins at approximately 3:15 p.m., and according to his testimony went directly to the Thompson home and arrived there in five minutes. He was met at the front door by Mrs. Dickins. He went to the bathroom and there saw Mrs. Thompson's mutilated body on the bathroom floor. There were two people present when Dr. Witte arrived,—one of them, the appellant, who was wounded and thoroughly bloody, the other was Mrs. Thompson, dead on the bathroom floor. The jury was warranted in inferring that Mrs. Dickins had taken part quite recently in a very bitter and bloody struggle, the evidence justifying the jury in finding that some of the blood on her clothes had come from Mrs. Thompson, and that not all of it had come from her own wounds. Her participation in the affray surrounding her mother's homicide was a reasonable and justifiable inference, and the jury might well have believed that she either committed it, or saw the person who did.

Under these circumstances, it is quite reasonable that Mrs. Dickins might have felt it necessary to make some explanation as to her own physical condition, with her clothing saturated with blood, her hair down over her face, her left hand bruised and wounded, and also other lacerations on her head and on her right hand; but, be that as it may, Mrs. Dickins did see fit to make a voluntary statement to the officers as to what she knew of the occurrence.

In her statement, which was given about 2½ hours after Mrs. Thompson's funeral, she stated that she had been requested by her mother to trim a shrub, and that she had gone to the Dickins' garage and there obtained her pruning shears and carried them to her mother's home; that on reaching the Thompson home she went to the refrigerator and poured a drink of water, and while drinking it on the back porch, she placed the shears on

top of the heater that was on this porch. Her mother had a cat and some kittens, and she was anxious to obtain from Mrs. Dickins some paper shavings that Mrs. Dickins had in order to make a bed for the cat and the kittens. Mrs. Dickens left the Thompson home and went to her own home to get these shavings, but was unable to find them. While there she took the temperature of her little daughter, who was sick in bed and was taking pencillin, talked with the cook about something for supper, and discussed with her young daughter the purchase of some embroidery thread, and then returned to the Thompson home. Mrs. Dickins said this was well past 2:30.

Her mother had stated that she would meet her at the back door, and go with her to the garage to bed down the kittens. Mrs. Dickins usually parked in front of the Thompson home on her visits there, but on this occasion she drove into the driveway leading to the garage, back to a point near the back door, where it was customary to stop when unloading groceries. She there stopped the car, got out and went into the back door of the Thompson home. Both the screen door and the entrance door to the porch, she says, were closed. On entering the porch she saw blood on the floor, and looking toward the bathroom she could see her mother's feet on the floor. She says that she immediately concluded that her mother had committed suicide as had her father, and she rushed toward the bathroom hearing her mother gurgle at the time she reached the door and satisfying her own mind that at that time her mother was still alive.

As she entered the door, she says she was attacked by someone standing against the wall in the bathroom, at the right side of the entrance door; that he immediately attacked her, and she engaged in a scuffle while her assailant was striking at her with the shears; that he caught her left hand and twisted and squeezed it, and that she was reaching for the shears to prevent her assailant from inflicting harm upon her with them, and that while so

struggling she was able to take the shears away from the man, and that she dropped them to the bathroom floor. Her assailant had inflicted two wounds on the right side of her head during this struggle. She was uncertain as to whether her assailant knocked her down or whether she slipped on the blood on the floor, but she is positive that she fell sprawling on the floor on her stomach, and in this way she accounts for the blood on her clothing; when she fell to the floor, her assailant fled. She got up, ran to the back porch, and saw the man, who was a Negro, fleeing out the back door, and her mind became satisfied that he was gone. She then immediately returned to the bathroom to see about her mother, and then went to the telephone in the adjoining bedroom and telephoned for Dr. W. S. (Bunte) Witte, and was told by Mrs. Paul Mason that he was operating. She rang again about 5 minutes later, and talked to Dr. K. L. Witte, and then sat on the radiator in the bedroom until Dr. Witte arrived.

When Dr. K. L. Witte arrived, he said that he went to the bathroom and found Mrs. Thompson's body on the bathroom floor; that she was dead, had been dead for a minimum of an hour, and her death was caused by multiple wounds; that she had enough cuts on her face and head to kill anybody; that the left side of her head was chopped all to pieces, and he identified photographs of the body which show that the right side of the head was practically mutilated, and that there were numerous lacerations and punctures over the head, the hand, and the arm of Mrs. Thompson. Dr. W. S. Witte arrived at the house at about 4:45 p.m., and while Mrs. Thompson's body was still on the bathroom floor, he made a physical examination and testified that she had multiple wounds on her head and there were numerous lacerations; that she had on a hairnet and most of her hair was gone; that he picked up the skin with the hair, and that it was nothing but a laceration and gruesome; that she had a

fractured skull over her right ear, about two inches long and three-fourths to one inch wide, and that she must have been hit 150 to 200 times around the head; that her right elbow was broken; the middle finger of her right hand was practically severed; the right ring finger on her left hand was severed and only hanging by the skin; there were lacerations on the left forearm, and multiple scratches on the right forearm. He examined Mrs. Thompson's body to determine whether or not there had been a criminal assault, and found no evidence of it whatsoever. He also testified that Mrs. Thompson had been in the hospital, and from the testimony of other witnesses it developed that she had returned to her home from the hospital at about 11 o'clock on the morning of the day of her death.

The witnesses agree that Mrs. Thompson's body was lying on its back on the bathroom floor, with the head toward the tub, and with the feet angling across the bathroom in the direction of the door or the commode. The shears were lying between Mrs. Thompson's head and a bathroom stool which was in the corner of the bathroom, in front of a small locker at the end of the tub, and that no blood was visible on the upper part of the shears, though the shears were resting in the blood that was on the floor. The back-porch floor, particularly the east side thereof, and the bathroom floor, were covered with blood; blood was spattered on the side of the tub, on the lavatory, and on the walls of the bathroom, and there was one mark on the ceiling near a corner. The doors and walls of the back porch were also spattered with blood, all indicating that there had been a terrific and bloody battle.

The shears were later found to have two hairs between the cutting blades, and these were determined, on chemical examination, to be the hair of Mrs. Thompson. Various specimens of hair were picked up from the floor, the tub, and the walls of the bathroom, and some from the

back porch, and all of these were determined to be the hair of Mrs. Thompson.

When Mrs. Thompson's body was picked up from the floor of the bathroom, a button was found on the floor underneath the arm of Mrs. Thompson. The testimony shows that the lapel was torn off Mrs. Dickins' jacket, or at least the lapel was torn. The State undertook to introduce Mrs. Dickins' clothing in evidence, evidently for the purpose of showing the torn lapel and that the jacket had a missing button identical with the button found under the arm, but this evidence was objected to by the defendant on the ground that the clothes had not been lawfully obtained from Mrs. Dickins, and that it was incompetent for the State to introduce them. This objection was sustained by the Court.

Mrs. Thompson's body, when observed by those first arriving at the Thompson residence, was lying partly on a rug on the bathroom floor. One of Mrs. Dickins' fingernails was found on this rug; the floor of the back porch showed drag marks, as if something had been dragged from the back porch into the bathroom. One of Mrs. Dickins' fingernails was found underneath the heater on the back porch, and it is argued by the State that Mrs. Dickins had dragged her mother's body on the rug from the back porch into the bathroom, where she finished her off to prevent identification, and that her fingernails were broken off in the operation of dragging this rug with the body on it.

When Mrs. Dickins submitted to a voluntary physical examination before Dr. Paul S. Lanier, her fingernails were all short.

Dr. Paul S. Lanier made a physical examination of Mrs. Dickins on November 24, 1948, which was seven days after the murder, and this examination was voluntarily submitted to by Mrs. Dickins. He found a laceration on the right parietal region three-fourths of an inch long and practically healed, a bruise on the right forehead the

size of a half dollar, located in the hairline, a blood clot beneath a thumbnail, a puncture wound of the left thumb, palmar aspect, the right thumb lacerated, lateral aspect, and the entire left hand showed evidence of an old bruise and slightly endemetous or swollen but there was no evidence of fracture. The fingernails were all short and smooth. There was a bruise about the size of a silver dollar, just above the right knee, anterior aspect of thigh, a small puncture wound about one inch below this, three bruises below the right knee, two of which were about the size of a silver dollar, and the other the size of a half-dollar, and multiple bruises below the left knee, five in number, varying in size from a silver dollar to a quarter. Mrs. Dickins made no attempt to account for these bruises, and her description of her fight with the Negro does not account for them.

A thorough search was made of the back steps, the yard, the entrance, the fences, and other possible avenues of departure, for any bloody tracks or other indications of the flight of any Negro from the scene of the crime, but though a diligent and minute inspection of the premises was made, no such evidence was found. The banks of Deer Creek, the Negro section of town, the warehouse and grounds were all searched for bloody clothing or shoes or tracks or other indications of clothing that had been removed and discarded, but no evidence of this kind was found. The Thompson residence was thoroughly examined for evidences of larcenous intent, but the other rooms were in order, nothing had been disturbed, and there was no evidence of any larcenous intent. A minute inspection was made of the back porch, the bathroom, the interior of the residence, and the premises for any article of man's clothing,—a hat, or cap, or any fragments from a man's clothing that might indicate that a man had participated in the struggle with Mrs. Thompson,—but none was found.

The bathroom in which Mrs. Dickins says that she had her struggle with the Negro measures 9 feet and 2 inches by 11 and 5 inches, and when the tub is considered, the remaining measurements are 6 feet 4¾ inches, by 11 feet 5½ inches. The measurement from the bathtub to the inside of the door-facing to the south wall is 4 feet 1½ inches, and the commode is situated in this corner of the bathroom. Mrs. Dickins says she did not step upon or fall upon her mother in her fight with the Negro.

Mrs. Dickins' statement implicated an alleged Negro in the two struggles in the bathroom and back porch of the Thompson residence, one with her mother, and one with her. The evidence does not disclose one thing,—a button, a hair, a hat, or anything whatsoever—to indicate that a third person had taken part in the affray. Clothing and hair fragments of Mrs. Thompson, and the fingernails of Mrs. Dickins were found, from which the jury might reasonably infer the fact of the participation of these two individuals, but the physical facts pointing to the presence of a Negro are entirely and significantly absent, except for Mrs. Dickins' statement. Mrs. Dickins did not take the witness stand to testify in her own defense, but apparently relied on the statement that she had given to the officers on the day of her mother's funeral.

The testimony clearly shows that the bathroom and hall floors were extremely bloody. No bloody tracks or traces of blood, leading either out of the door or into or through the yard, or out of the yard, were found. The jury might reasonably infer that a fleeing Negro would not be likely to have stopped to wash the blood from his shoes before fleeing, and that if bloody, as in reason the Negro would have been, he could not have escaped without leaving behind him a track, or a trace, or without being seen by someone in the Town of Leland on this midafternoon with the weather clear and sunny, as the evidence shows it to be.

The evidence shows that Mrs. Dickins knew both the Leland Chief of Police and the Washington County sheriff personally, and that in giving her statement to these officers she frequently referred to each of them by calling them by their given names. The evidence shows that she did not phone either of these officers to give any alarm, nor did she spread an alarm in the neighborhood, or ask anyone in the neighborhood for help. The evidence shows that she talked twice by telephone to Mrs. Mason at the Witte Clinic, whom she knew well, in a calm and unexcited voice, and made no mention of the fact that her mother was dead and made no reference to an absconding guilty Negro. The evidence further shows that the only person Mrs. Dickins called, other than the doctor, was her sister, who lived several miles out in the country, and there is no evidence showing that Mrs. Dickins disclosed the situation to any of the telephone operators handling her calls for her.

The jury could well have been of the opinion that Mrs. Dickins could not have taken the shears from any Negro man in the fashion set out in her statement. They could have further believed it unreasonable to suppose that a Negro who had killed Mrs. Thompson in the manner in which she was killed, would have fled leaving Mrs. Dickins, a witness, prostrate on the floor, and just a few feet away from a telephone, with which she could have spread an alarm. The jury could have reasoned that this Negro would have killed Mrs. Dickins, too, since she was, under her statement, on the floor and helpless to prevent a homicidal assault upon her. The jury could have reasoned that whoever killed Mrs. Thompson continued to beat her until sure of her death in order to prevent identification by her, and if so such reasoning would lead to the further conclusion that the slayer would have taken the same precaution with Mrs. Dickins.

There are other circumstances which could have influenced the jury in concluding that there was no Negro

in Mrs. Thompson's house at the time she was killed. The homicide took place in mid-afternoon in a residential area. The evidence negatives any larcenous activity, and further negatives any criminal assault. After Mrs. Thompson was down dead, the slayer continued to strike her, and, according to the testimony of Dr. Witte, forty or sixty per cent of the wounds were inflicted on Mrs. Thompson after she was dead. The testimony is susceptible of the reasonable inference that whoever killed Mrs. Thompson dragged Mrs. Thompson's body on a rug from the back porch to the bathroom, and these circumstances are sufficient to raise in the minds of the jury a doubt as to the complicity in the crime of a Negro. It is quite reasonable that a combination of all of these circumstances is sufficient to convince the minds of reasonable men to the required degree of certainty that no Negro was involved.

In this connection it might also be considered that the jury could have further believed that Mrs. Thompson knew her assailant and that the slayer, therefore, continued to beat her in order to insure death and prevent identification. A strange Negro would not be in this category since Mrs. Dickins said she had never seen the Negro before, and it is likely that most, if not all, of the Negroes known to Mrs. Thompson were also known to Mrs. Dickins.

The testimony of Drs. Witte and Lanier makes it apparent that Mrs. Dickins had taken part in a terrific violent struggle, and it appears that Mrs. Thompson's life was lost in just such a struggle. The jury could have inferred that the nature of Mrs. Dickins' injuries was not in keeping with an encounter of the kind she described as having been had with a Negro. The jury might reasonably believe that the physical facts strongly imply a prolonged fight rather than a comparatively brief fight on the part of Mrs. Dickins, and might infer this fact from the tearing of Mrs. Dickins' blouse, the severing of

her fingernails, the wounds on her body, the bloody condition of her clothing, and her physical appearance when outsiders arrived. The jury could also have reasonably inferred that a Negro would have had no great difficulty in killing Mrs. Thompson, and would have been very unlikely to have inflicted those multitudinous wounds, and that he would have finished Mrs. Thompson off quickly and decidedly without this continued beating and mutilation. The jury could have reasoned that the nature of these wounds indicate the act of a woman, rather than of a man.

The relatively clean shears with which this crime was undoubtedly committed could reasonably lead the jury to the conclusion that the killer tried to erase possible fingerprints on the shears. A wet and bloody lady's handkerchief was found in the bathtub, and the jury could logically have reasoned that this handkerchief was used for the purpose of washing the blood and fingerprints from these shears; they might further have reasoned that it is unlikely that a Negro would have stopped to wash the shears to remove the evidence of crime, particularly when Mrs. Dickens denies any such act on the part of the alleged Negro.

Dr. K. L. Witte stated that on reaching the body in the bathroom, he went to the telephone in the bedroom to notify the Chief of Police of Leland of the crime; that after leaving the telephone he noticed his bloody tracks on the bedroom floor. He remembered that Mrs. Dickins had called him from this telephone, and looked to see if there were other bloody tracks on the floor, and he found none.

Dr. Witte testified that his examination of Mrs. Thompson's body was within seven minutes of the time he received Mrs. Dickins' call, and that Mrs. Thompson had been dead a minimum of one hour when he made this examination. She had stated that she was positive that Mrs. Thompson was breathing and gurgling when she

arrived at the bathroom of the Thompson home, immediately before her attack by the Negro; that her fight with the Negro lasted only a minute or two; that she immediately got up from the bathroom floor, ran to the back porch to behold the Negro fleeing, then went to her mother, then went immediately to the telephone making the call to Dr. Witte, only a matter of moments subsequent to the fight with the Negro. The jury could have believed that this testimony of Dr. Witte was true, and that it seriously contradicted the testimony of Mrs. Dickins as to the facts and circumstances surrounding the occurrence. The delay in calling a doctor could have been interpreted by the jury as indicating, among other things, clean-up operations on the part of Mrs. Dickins, with the intent of destruction of incriminating evidence and the fabrication of an explanation. In addition, Dr. Witte said that Mrs. Thompson died before her assailant had completed the butchery, and that from forty to sixty per cent of the wounds had been inflicted on Mrs. Thompson after her death. If this is true, then Mrs. Dickins' statement that her mother was alive on the bathroom floor would be contradictory as she does not claim that the Negro struck her mother after her arrival.

With reference to the question of motive, which is always a circumstance in cases of circumstantial evidence to indicate the guilt or lack of guilt of a person, it appears from the evidence that Mrs. Dickins was borrowing money and hiding her acts in so doing from her husband and from the bank, and in one instance had made a loan of $750.00 from a loan company in August of that year, and had paid the loan company a brokerage fee of $152.03 to procure the loan for her. Her mother had rented some land to Mr. Hampton Collier for a rental of $600.00 per year, and this annual rent was due, and Mrs. Dickins had made three trips, either on the day of the homicide or the day before, to the Collier gin for the collection of

this rent, and received a check payable to Mrs. Thompson for the rent.

The jury might well have concluded that her anxiety in making these three trips for the check indicated that she had a strong personal interest in obtaining it, and that the fact that the proof shows that she had been with her mother on two or more occasions after receiving the check, and had not delivered it to her, or obtained her mother's indorsement, after being so eager to get the check, might reasonably suggest that she had not been able to get her mother to agree as to the disposition of the check and its proceeds. Mrs. Dickins did not mention the check in her statement to the officers, though she discussed her mother's inability to pay her own hospital bill, and the jury might have reasonably inferred that the disagreement over the handling of this $600.00 check caused the death of Mrs. Thompson.

We have discussed the evidence at some length because in the appellant's assignment of error it is charged that the lower court erred in refusing to grant to the appellant a peremptory instruction, and also that the court erred in overruling the appellant's motion for a new trial on the ground that it was contrary to the overwhelming weight of the evidence.

Almost one hundred years ago this Court held in McCann v. State, 13 Smedes & M. 471, that ██ ██ "Circumstantial evidence has been received in every age of the common law; and it may rise so high in the scale of belief as to generate full conviction; when, after due caution, this result is reached, the law authorizes its ministers to act upon it.

██ ██ "Where a conviction depends upon circumstantial evidence, the legal test of its sufficiency for that end is its power to satisfy the understanding and conscience of the jury. It is sufficient if the circumstances produce moral certainty, to the exclusion of every reasonable doubt."

The decision in the McCann case was preceded by the decision in Cicely v. State, decided in 1849, where the Court said: "In cases depending upon direct testimony, where the facts or circumstances established by direct proof point strongly to the guilt of the accused, his relation of the occurrence is frequently a matter of great importance. His statement, if true, may explain facts of a doubtful character, which otherwise would tend strongly to the conclusion of his guilt; and if it be reasonable and consistent in itself, should always have weight with the jury. On the other hand, if it be unreasonable or contradictory, and proved to be false, it must, upon acknowledged principles, increase the presumption of his guilt." Cicely v. State, 13 S. & M. 202, 21 Miss. 202.

The jury has decided the question of the guilt or the innocence of the appellant, and the authority of this Court on appeal was discussed by this Court in Browning v. State, 33 Miss. 47, wherein the Court said: "Circumstantial evidence is peculiarly within the province of the jury, because it is always solemnly to be weighed and acted upon by their understandings and consciences; and from its nature is the subject of inferences and conclusions in their minds; ██ █ a verdict, therefore, found on circumstantial evidence, will always be permitted to stand, unless it is opposed by a decided preponderance of evidence, or is based on no evidence whatever."

See also Sauer v. State, 166 Miss 507, 144 So. 225; Dean v. State, 173 Miss. 254, 160 So. 584, 162 So. 155; Johnson v. State, Miss., 23 So. (2d) 499.

After a careful and painstaking examination of the record in this case and from all the evidence adduced on the trial, we are of the opinion that the court below did not err in refusing to grant the peremptory instruction requested by the defendant, nor did it err in overruling a motion for a new trial. The guilt or innocence of Mrs. Dickins was a question to be submitted to the jury for

decision.. The jury determined that Mrs. Dickins was guilty, and their decision was not against the overwhelming weight of the evidence, as supported by this record, but was rather supported by the overwhelming weight of the evidence, and justified them in finding Mrs. Dickins guilty of the charge of murder beyond every reasonable doubt.

It is urged that the court erred in giving the State the following instruction: ''The court instructs the jury for the State that malice may be implied by law from the nature and character of the weapon used, and that the deliberate use of a deadly weapon in a difficulty, not in necessary self defense, real or apparent, is, in law, evidence of malice.''

It is true, as contended by the appellant, that this Court has repeatedly held that ██ ██ where all the facts and circumstances surrounding a homicide are fully disclosed by the evidence, it is reversible error for the court to instruct that the law presumes malice from the use of a deadly weapon. Batiste v. State, 165 Miss. 161, 147 So. 318; Walker v. State, 146 Miss. 510, 112 So. 673; Cumberland v. State, 110 Miss. 521, 70 So. 695; Smith v. State, 161 Miss. 430, 137 So. 96; Winchester v. State, 163 Miss. 462, 142 So. 454. There can be no possible question about the soundness of these decisions, but they have no application to the case at bar.

██ ██ The law does presume malice from the killing of a human being with a deadly weapon, and this presumption, as is the case with all similar legal presumptions, prevails and characterizes the homicide as murder, unless facts are introduced in evidence changing the character of the killing and showing either justification or necessity, and when these explanatory facts are in evidence, then just as is the case with all presumptions, the presumption yields to the facts and consequently there is no longer any presumption because the presumption has yielded to the facts, and the facts and circumstances

surrounding the killing are all in evidence, and there is no longer any need or justification for any presumption, but where the facts and circumstances surrounding the deliberate use of the deadly weapon have not been put in evidence, and have not been established for consideration by the jury, then the presumption does not yield to the evidence, and the presumption of law which is that the killing of a human being with a deadly weapon was a malicious killing, and that the act was murder, unless the facts in evidence explain the character of the killing, then this presumption still stands, and the State is entitled to an instruction announcing this legal principle. This question has already been decided in Durr v. State, 175 Miss. 797, 168 So. 65, 68, where this Court said: ''The presumption of malice which arises from the killing of a human being with a deadly weapon will prevail and characterize the act as murder, unless the facts in evidence change the character of the killing by showing either justification or necessity''.

 Mrs. Dickins has made no explanation of the facts surrounding her deliberate use of the deadly weapon in inflicting the fatal wounds upon her mother. In fact, she denies that she killed her mother, or that she used any deadly weapon upon her, or that she had any design to effect the death of her mother. Consequently, there is no evidence in this case explaining the facts surrounding the deliberate use of a deadly weapon that might change the character of the killing by showing either justification or excuse, and hence the presumption of law characterizes the act as murder, and the instruction to the jury was proper. We find no error in this instruction.

It is further charged that the court erred in giving the following instruction for the State: ''The court instructs the jury for the State that malice aforethought mentioned in the indictment does not have to exist in the mind of the slayer for any given length of time; and at

the very moment of the fatal blows, if the defendant was inflicting the blows with the deliberate design to take the life of Mrs. Idella Long Thompson, and not in necessary self-defense, real or apparent, then it was as truly malice and the act was as truly murder as if the deliberate design had existed in the mind of the defendant for minutes, hours, days, weeks, or even years.''

The only objection made to this instruction is that it assumes that Mrs. Dickins killed her mother and appellant cites Cunningham v. State, 87 Miss. 417, 39 So. 531; Ellerbe v. State, 79 Miss. 10, 30 So. 57; Walton v. State, 87 Miss. 296, 39 So. 689; Fore v. State, 75 Miss. 727, 23 So. 710; and De Silva v. State, 93 Miss. 635, 47 So. 464, as requiring a reversal.

 It is true that an instruction must not assume as a fact any fact that is in issue, or where there is no evidence to support it, and this principle is clearly announced in the cases relied upon by the appellant. However, the instruction complained of here does not assume as a fact that Mrs. Dickins inflicted the fatal blow, for it clearly provides: ''If the defendant was inflicting blows . . .'' requiring the jury to first believe beyond every reasonable doubt that Mrs. Dickins was inflicting the blows. This qualifying word ''if'' eliminates any possibility of there being an unwarranted assumption by the jury. In addition, all of the instructions given in the case, both for the State and for the defendant, must be construed as one instruction, and the instructions granted the defendant clearly require that the jury believe beyond every reasonable doubt that Mrs. Dickins did inflict the blows before they could find her guilty as charged.

We find no merit in any of the errors assigned by the appellant, and after careful and painstaking consideration of the entire evidence in the case, the Judges of this Court are unanimously of the opinion that the judgment of the lower court should be affirmed.

Affirmed.

**Alexander, J.** (specially concurring).

While I concur in the reasoning and conclusions of the opinion of the Court, I should like to withhold my approval of the instruction given the State upon the so-called presumption of malice arising from the deliberate use of a deadly weapon. My views upon this question were set forth in Hughes v. State, Miss., 42 So. (2d) 805. See also Criss v. State, 202 Miss. 184, 30 So. (2d) 613.

### ON SUGGESTION OF ERROR

In Banc. Jan. 23, 1950, (43 So. (2d) 887).

**Hall, J.**

In the suggestion of error appellant manifests considerable concern that the original opinion herein, in quoting from McCann v. State, 13 Smedes & M. 471, has changed the law of this state with respect to the rule governing juries in cases of circumstantial evidence. In citing that case we were primarily emphasizing the fact that convictions may rest entirely upon circumstantial evidence if it rises sufficiently high in probative power to satisfy the conscience and understanding of the jury. But appellant singles out one brief quotation from the McCann case to the effect that circumstantial evidence ''is sufficient if the circumstances produce moral certainty, to the exclusion of every reasonable doubt'' and apprehends that since this quotation omitted the additional words ''and every reasonable hypothesis other than guilt'' we failed to apply the proper rule in the decision of this case.

In the original opinion, we cited Sauer v. State, 166 Miss. 507, 144 So. 225, 229, and that decision was before us in the consideration of this case and was one of the authorities upon which our conclusions were based. In considering the propriety of an instruction granted to the State in that case, this Court said: ''It is always

true that the jury are not required to know facts absolutely. They must believe from the evidence, and their belief must arise from the evidence, or the want of evidence, and the jury must not use anything except that which is offered in evidence. The latter part of the instruction clearly informed the jury that they are only required to believe, from the evidence, beyond all reasonable doubt, and to the exclusion of every other reasonable hypothesis, that the defendant was guilty. Applying the rule as to the sufficiency of circumstantial evidence, it must be a reasonable hypothesis. Circumstantial evidence does not have to exclude every possible doubt, but only every reasonable doubt, or reasonable hypothesis.''

Our function as an appellate court is to examine the record of the trial and determine whether any error of law was committed by the trial court, and, in that connection, whether the facts in evidence are sufficient to sustain the jury's verdict. We have again considered the record before us and we are of the unanimous opinion that the jury was warranted, upon the evidence, in finding appellant guilty. We are of the further opinion that no error of law, sufficient to justify a reversal, appears in the record.

The crucial test here is not whether our original opinion may have contained an erroneous statement or conclusion of law, which in our judgment it did not, but whether such error was committed in the trial below. The greater portion of the Suggestion of Error deals with the omission of the words ''reasonable hypothesis'' in the original opinion herein. Examining the record on this point, we find that the instructions to the jury clearly recognized it; five times the instructions for the State told the jury that they must ''believe from the evidence beyond all reasonable doubt and to the exclusion of every reasonable hypothesis other than guilt'' that the defendant is guilty. The appellant obtained the following instruction:

''The court instructs the jury for the defendant that

although circumstantial evidence is admissible in any case, still in its application the jury must use the utmost caution and vigilance, and it is not sufficient to convict where, assuming all to be proved in behalf of the State which the evidence tends to prove in that behalf, there remains within the evidence or the want of evidence some other reasonable hypothesis consistent with innocence, for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of truth. The circumstances proved may produce a strong suspicion of guilt, but that is insufficient to justify a verdict of guilty at your hands.''

In six other places in appellant's instructions to the jury they were charged on the subject of reasonable hypothesis. In addition, she obtained the usual instruction on the proposition of ''two reasonable theories''; another that her version, if reasonable, must be accepted as true unless substantially contradicted in material particulars by a credible witness or witnesses or by the physical facts or by the facts of common knowledge; another which is commonly called the ''sinker'' instruction to the effect that it is the duty of each individual juror to decide the issues for himself and to arrive at his own verdict even though every other member of the panel may disagree with him; another on the subject of reasonable doubt; another on the presumption of innocence; and another that the indictment is no evidence against her. The jury was fully and correctly charged upon the applicable principles of law, and particularly upon the subject of reasonable hypothesis in cases based upon circumstantial evidence. Since we find no error in the record, and since in our opinion the evidence is sufficient to sustain the verdict, the Suggestion of Error is overruled.

Suggestion of error overruled.

LEE, J., took no part in the consideration of and decision on the Suggestion of Error.