407 So.2d 815 (1981)
Donna S. TOLBERT
v.
STATE of Mississippi.
No. 52925.
Supreme Court of Mississippi.
December 16, 1981.
Richard E. Stratton, III, Brookhaven, for appellant.
Bill Allain, Atty. Gen. by Carolyn B. Mills, Sp. Asst. Atty. Gen., Jackson, for appellee.
*816 Before SMITH, P.J., and WALKER and BOWLING, JJ.
SMITH, Presiding Justice, for the Court:
Donna S. Tolbert was indicted for the murder of Tim Faust. She was tried upon that charge in the Circuit Court of Copiah County, convicted, and sentenced to life imprisonment. She has appealed, assigning for reversal several grounds.
At the time of the homicide, Donna Tolbert was employed by Faust as bookkeeper and receptionist in the operation of an insurance agency in the City of Hazlehurst. The agency office occupied the ground floor of a building fronting on a public street in the downtown business section of Hazlehurst. The testimony, including that of Tolbert, is undisputed that there was only one way in or out of the office, and that was by way of the front door which opened upon the public sidewalk.
The office consisted, in addition to the room used for the transaction of business, of a bedroom, a bath and a kitchen. The murder weapon was identified as a butcher knife from the kitchen. The homicide occurred in the agency office at about 8:00 on a week day morning, on a clear day. At that time, there was traffic on the street and people were moving about. Witnesses occupying various points of vantage, had their attention drawn to the front (and only) door of the office by a "noise", and by the sight of Faust who staggered out of the door covered with blood. It was later determined that Faust had suffered one stab wound in the back and six stab wounds in the chest, one of the stab wounds having pierced his aorta and having penetrated more than six inches into his chest. Faust also had sustained two "defense type" wounds in the left and right forearms. From these injuries Faust died in a very short time.
Faust was seen to emerge from the door of the office the front of the office having been under observation by one or more of several persons on the street on which the office fronted. No person other than Faust himself, and later Tolbert, was seen to emerge from the office. Tolbert's defense is based upon her statement that an unknown "black man" had come into the office and had engaged in an argument with Faust over a debt. She said, and later testified, that it had not been she, but this black man, who had stabbed Faust to death. Tolbert testified that after stabbing Faust the black man had first run toward the back of the apartment (office). She said that there was no possible exit in that direction and that the man had returned and had then left the office following Faust who had previously gone out the door. This black man was seen by no other person of the several who were observing the office entrance through which they had seen Faust emerge.

THE VERDICT OF THE JURY WAS SUPPORTED BY SUFFICIENT EVIDENCE
A number of witnesses saw Faust fall from the front door of his office onto the sidewalk. Each of them saw Tolbert afterward come to the door, return into the office and then come outside again. No one saw anyone else leave the office or flee the scene.
Despite the fact that there were several persons in a position to observe the front door of the agency office from the time Faust emerged until after Tolbert had come out for the second time, no witness observed a "black man" or anyone other than Faust and Tolbert come out of the office. Tolbert had testified that after the black man had stabbed Faust he threatened her "So I went into Mr. Faust's office and as I went in the man ran past down the hall towards the back of the office building. I looked out and Mr. Faust had gotten to his feet and was making his way to the front door and the man then ran back past, and Mr. Faust had the door open and was going out, and the man ran out directly behind him." (Emphasis added).
Tolbert reiterated this statement on cross-examination when she had been asked if she had meant to say "That when the alleged black man went out the front door that Mr. Faust had already gone out?" She *817 said again "Mr. Faust was holding onto the door" and also that "He had gone out."
Witness Hardy Brown said that his attention was drawn to the door of the office by the noise when Faust had "hit up against the door." He said that after hearing the noise his "eyes was still on Tim Faust's door, over in that direction."
Brown testified that when Faust had fallen out the door "A lady come to the door and stood up there about a second or two and walked back in the office." The witness said that after Tolbert had looked at Faust and returned to the office she afterward came out a second time "bleeding and calling for help." He stated that it was when she had come out the second time that she began "hollering for help," and started crying and screaming.
On cross-examination Hardy Brown testified that, after hearing the noise of Faust falling against the door as he came out of the office, in response to the question: "You just kept your eyes glued to the Faust Insurance Agency door?" answered: "Time this happened I did."
Witness Ann Jenkins testified that she saw Mr. Faust coming out of his door and holding onto the door and that, at the time, she herself had been "right at the edge of the sidewalk going on to the street."
Ann Jenkins was coming out of the bakery when she saw Faust fall out of the door onto the sidewalk, covered with blood. She caught a glimpse of some other person behind Faust whom she described as "a white face and whoever it was had dark hair." She ran toward Faust from the bakery shouting, "He's bleeding to death," and it was then that she saw Tolbert emerge from the office. Mrs. Jenkins saw no other person leave the office or flee the scene.
Donna Goodman, also employed in a secretarial capacity by the Faust agency, had stopped at a traffic light when she observed Faust "hanging" on the outside of his office door and observed him as he fell out of the door face down on the sidewalk. Mrs. Goodman saw no other person other than Faust and Tolbert leave the office.
All of these witnesses agree that no black man or anyone else, other than Faust and Tolbert, came out of the office door.
Other witnesses who had been in the vicinity support the fact that no black man was seen to emerge from the office or flee the scene.
There was evidence that prior to the murder Faust had discovered several inconsistencies or discrepancies in his office checkbook, check stubs, and bank accounts, several check signatures which were questionable. One of Tolbert's duties was to fill out the check stubs and checks. On Thursday, June 26, Faust had asked Debbie Robinson, also an employee of the agency, to examine the signatures on eight Faust checks (numbers 17931, 19504, 18740, 19398, 19404, 19505, 19405 and 19406). These cancelled checks were found to have been in Faust's pocket at the time he was killed. Mrs. Robinson testified that five of the checks did not bear the genuine signature of Faust. The checks referred to were the last five of those enumerated above. These checks were as follows:

 CHECK STUB INFORMATION ON
 NUMBER INFORMATION CANCELLED CHECKS
 18740 1/28/80 Amount: $460.00
 To: David Cloyd Amount payable to:
 1979 Dividend Merchandise and
 $21.90 Planters Bank
 19398 6/4/80 Amount: $710.00
 To: Terry Breland Payable to: Blank
 $28.16 No Endorsement
 19404 6/4/80 Amount: $380.00
 To: Annie Henry Payable: Blank
 $12.00 No Endorsement
 19405 6/4/80 Amount: $230.00
 To: Edwina Varnado Payable to: Blank
 $19.20 No Endorsement
 19406 6/5/80 Date: 6/6/80
 To: Haynes Brinkley Amount: $671.00
 Amount: $17.00 Payable to: Blank
 For: C. Barnes-additional No Endorsement

Faust had made inquiries of office personnel, including Tolbert, about the Merchants and Planters Bank and certain refunds. On Thursday, June 26, Tolbert showed Mrs. Robinson the following letter she had written to Faust.
Mr. Faust, I told you when I first started here that if we had a problem to *818 please let's talk it out. There is a problem, but I don't know what it is. I have hinted that I am not above making mistakes and I do make them, and I consider a small one as serious as a large one. I do try my best to do the accounts. I know you doubt me, because it seems lately you'll ask "Are you sure?" All the time. I know I mess up on things, but I've never had to check thing like this or send payments or write checks, or deal with so many different companies before. I also admit I tend to carry over old habits from working with one company for so long, but I try. I know that in the last few months there have been so many mistakes that anything wrong can really throw things off. And I am responsible. I catch all the responsibility and I guess I should. Its' quite a burden. Sometimes I want to throw my hands up. Some days I need three heads and eight hands. I go to bed at night worried. Have I paid this, did this get renewed, did so and so get paid, is this or that late notice paid. I've never been under so much pressure or such a work load but I have considered it a part of the job and good experience. Since I have come back from vacation, there has been something wrong. Is it because I cancelled our car insurance? Jimmy wrote it but I figured you knew that and would do the same thing in my place. Besides in lieu of a pay raise you were going to pay this and I know you were worried about money so much lately. Which brings us to something else. You mentioned being $10.00 short. I didn't take it. You don't mention things to Timmy and Debbie but I did. Timmy said it came from Curley Johnson. When you said that, I wondered, do you think I took it? No. sir, I don't need your money. If I cash a check for $10.00 or $110.00 I always take the amount I need. I have been trying to balance your checkbooks since January. That's the only place I could start. I have tried to catch them up at home, but as you have said so much, that ain't possible. I made headway. You think I signed a check. I never have, but if I did I'd tell you. I try to catch mistakes and unsigned checks but I don't sign your checks. I have checked to see what checks cleared, what didn't and if the stubs are entered correctly. I have caught mistakes where I write all the checks at one time, get in a hurry and not enter them correctly, or something but I also try to find these when statements come in. Granted they aren't balanced, but I will work Saturday afternoon if you want. Timmy says you worry all the time about overdraft. I know that, and I would gladly give you all I have to help you. I love my work, I love this office and I care a great deal about you and this office. Please talk to me. Holler at me, tell me you think I screw up, am careless, take your money, mess up your accounts, but please let me know what I've done. I don't want you suspicious of me or distrustful. I'd do all I could to take worry off you cause I know you have them. Just let me. I don't mind being called stupid if I am, and I admit I have said yes when I should say I don't know, or no. It's hard to admit you mess up and sometimes we all have to be forced to do that. Talk to me, Mr. Faust. I don't want you to start thinking I'm a detriment to you.

Donna
Mrs. Robinson testified that on Tuesday, prior to the murder on Friday, Faust had shown the eight checks to Tolbert and had told Tolbert "To get the money up." Robinson testified that Tolbert then left the office but later returned and had given Faust a note saying "You will be reimbursed Friday morning." Robinson recognized and identified Tolbert's handwriting on the note and this note was placed in evidence.
The president of Merchants and Planters Bank on which the checks were drawn, testified that on Tuesday, July 8, Faust had come to his office with seven of the checks and he had attempted to assist Faust in determining the authenticity of the purported Faust signature which appeared on the checks. The president testified that he had determined at Faust's request that *819 these checks had been used to purchase money orders. The money order department in New Orleans was contacted to ascertain who the payee had been on the money orders. In this investigation the president was assisted by Mrs. Hutchinson, assistant cashier and head teller of the bank. The assistant cashier testified that on July 10, Faust had brought in the eighth cancelled check, 17931, for $302.00. Mrs. Hutchinson testified that she had consulted her proof tape and that on July 10 had given Faust the following information concerning the checks:

 Check #17931 In the amount of $302.00 purchased
 money order #034 2000 7 for
 $302.00; payee for money order:
 James C. Tolbert; payor:
 Donna Tolbert
 Check #19404 In the amount of $380.00
 Endorsed: Donna Tolbert, for
 deposit only; purchased money
 order #034 25526 for $380.00;
 payee for money order:
 Donna Tolbert; payor:
 J.C. Tolbert, Sr.
 Check #19405 In the amount of $230.00
 purchased money order
 #034 25525 for $230.00;
 payee for money order:
 Styled Room; payor:
 Donna Tolbert
 Check #19504 In the amount of $288.00
 Endorsed: Donna Tolbert, for
 deposit only; purchased money
 order #034 25870 for $280.00;
 payee: Donna Tolbert;
 payor: J.C. Tolbert, Sr.
 Check #18740 In the amount of $460.00
 exchanged for cash on 1/28/80

Three of these money orders were traced to appellant's bank accounts. Money orders numbers 034 25526 and 034 25870 were deposited in appellant's account number 338 1621 at the Bank of Hazlehurst. Additionally money order number 034 2007 was deposited into the savings account of appellant at the Bank of the South.

ADMISSION OF TESTIMONY TENDING TO ESTABLISH MOTIVE IN CIRCUMSTANTIAL EVIDENCE CASE NOT ERROR
Tolbert contends that admitting this testimony was error since it consisted of a violation of the general rule that proof of a crime distinct from that alleged in the indictment should not be allowed in evidence against an accused.
However, in 29 Am.Jur.2d Evidence § 321 (1967), appears the following relevant statement:
It is not to be inferred, from the rule regarding the inadmissibility in criminal prosecutions of evidence of other crimes or offenses, that such evidence must be excluded in all cases and under all circumstances; rather, there are a number of well-recognized exceptions to and limitations upon the general rule... . Evidence of other criminal acts is usually competent and admissible to prove the accused's identity, knowledge, intent, and motive, to show a common criminal scheme or plan, and in negation of the likelihood that the crime was committed as a result of inadvertence, accident, or mistake. Evidence is admissible for such purposes on the theory that the other crimes are so connected with the offense charged as to throw light upon it. .. .
As a further exception to the rule of inadmissibility, when the fact of a former crime is an element in the offense charged, evidence of it is admissible. Evidence covering the commission of other offenses is likewise admissible where two or more crimes are so linked together in point of time or circumstance that one cannot be fully shown without proving the other, or where they form part of the res gestae... . [Footnotes omitted].
The testimony of which appellant complains was admissible to show motive. Recently in Gardner v. State, 368 So.2d 245, 248 (Miss. 1979), this Court held:
The general rule is that proof of a crime distinct from that charged in the indictment should not be admitted into evidence against an accused. Cummings v. State, 219 So.2d 673 (Miss. 1969). There are, however, exceptions to this rule as noted in Floyd v. State, 166 Miss. 15, 148 So.2d 226 (1933), and which has been elaborated upon in Horton v. State, 288 So.2d 467 (Miss. 1974), as follows:

*820 ... [T]hat proof of such other crime is admissible if it sheds light upon the motive for the commission of the crime charged in the indictment. Tanner v. State, 216 Miss. 150, 61 So.2d 781 (1953). Proof that defendant is guilty of another crime is admissible when that fact (1) tends to show that the deceased officer had a right to arrest the appellant without a warrant, or (2) tends to show that the accused knew why he was being arrested, and therefore sheds light on the motive for the commission of the crime for which accused is being tried. White v. State, 70 Miss. 253, 11 So. 632 (1892). (288 So.2d at 468)
Also, in Gray v. State, 351 So.2d 1342 (Miss. 1977), this Court said:
It is well settled in this state that proof of a crime distinct from that alleged in an indictment is not admissible against an accused. There are certain recognized exceptions to the rule. Proof of another crime is admissible where the offense charged and that offered to be proved are so connected as to constitute one transaction, where it is necessary to identify the defendant, where it is material to prove motive and there is an apparent relation or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge. See, Smith v. State, 223 So.2d 657 (Miss. 1969), cert. denied, 397 U.S. 1030, 90 S.Ct. 1274, 25 L.Ed.2d 542 (1970); Cummings v. State, 219 So.2d 673 (Miss. 1969), cert. den. 397 U.S. 942, 90 S.Ct. 954, 25 L.Ed.2d 122 (1970).
[351 So.2d at 1345].
Circumstantial evidence need not exclude every possible doubt but only every reasonable doubt, or reasonable hypothesis of innocence. Sauer v. State, 166 Miss. 507, 144 So. 225 (1932). See also: Thorne v. State, 348 So.2d 1011, (Miss. 1977), Walton v. State, 212 Miss. 270, 54 So.2d 391 (1951).
A conviction may be had on circumstantial evidence alone. Fortenberry v. State, 216 Miss. 243, 62 So.2d 325 (1953).
In Bonnett v. State, 317 So.2d 907 (Miss. 1975) and Burge v. State, 282 So.2d 223 (Miss. 1973), both cited and quoted from Johnson v. State, 23 So.2d 499 (Miss. 1945). In dealing with the sufficiency of circumstantial evidence, this Court said in Bonnett v. State, supra:
The only question in this case is, is the circumstantial evidence sufficient to support the verdict of the jury? In Johnson v. State, 23 So.2d 499 (Miss. 1945), we said:
... The question must be determined by a jury in each particular case within the principles prescribed by law; within these limitations, the power of circumstances to satisfy the understanding and conscience of the jury beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence, is always the test of the sufficiency of circumstantial evidence.
It was long ago held by this Court in the case of Browning v. State, 33 Miss. 47, citing Cicely v. State, 13 Smedes & M. 202, 211, and the principle has been uniformly adhered to since that time, that the sufficiency of circumstantial evidence is peculiarly for the determination of the jury, "because it is always solemnly to be weighed and acted upon by their understandings and consciences, and is, from its very nature, the subject of inferences and conclusions in their minds," and that "a verdict, therefore, found on circumstantial evidence, will always be permitted to stand unless it is opposed by a decided preponderance of the evidence, or is based on no evidence whatever." (23 So.2d at 500.) (Emphasis supplied.)
See also Burge v. State, 282 So.2d 223 (Miss. 1973); Bone v. State, 207 Miss. 868, 43 So.2d 571 (1949); Dickins v. State, 208 Miss. 69, 43 So.2d 366 (1949).
[317 So.2d at 909-910].

*821 THE ALLEGED HEARSAY TESTIMONY WAS PROPERLY ADMITTED
It is contended that the trial court erred in admitting testimony regarding the conversations between Faust and Debbie Robinson and between Faust and the bank officials. When objection was first made to the admission of this testimony, the trial court sustained the objection. But when the State informed the court that the testimony was not being offered for the purpose of establishing the truth of what was said but only for the purpose of showing "an independently relevant fact." This was, as the trial court noted, that the testimony of Debbie Robinson tended to prove that Faust, the victim of the homicide, recently had discovered the disparity between the check stubs and checks themselves and his bank accounts and had confronted Tolbert with this fact. The testimony of the bank officials also tended to show that Faust had recently discovered these discrepancies and believed they represented a misappropriation of his funds. This evidence is particularly significant in the light of Tolbert's letter to Faust and her note to him saying that "You will be reimbursed Friday."
The above testimony was offered by the State to establish motive. In a case where circumstantial evidence is relied upon, it is especially proper that motive be shown. Such evidence is relevant as rendering more probable the inference that the defendant committed the homicide. See Ladner v. State, 197 So.2d 257 (Miss. 1967). In admitting the evidence for the restricted and limited purpose for which it was offered, the trial court relied upon and quoted several authorities to support his action:
McCormick on Evidence, 2nd Ed., West Publishing Co. 1972 defines hearsay evidence as follows: "Hearsay evidence is testimony in court, or written evidence, of the statement made out of court; the statement being offered as an assertion to show the truth of the matters asserted and thus resting for its value on the credibility of the out-of-court asserter." (Emphasis added).
"Where the fact that a particular statement was made is of itself a relevant fact, regardless of the truth or falsity of such statement, the statement is admissible in evidence as an independently relevant fact." Handshoe v. Daly, [211 Miss. 189, 193, 51 So.2d 230, 232 (1951)]. See 31A C.J.S. Evidence Sec. 239 (1964)... . Also Lawler v. Skelton, [241 Miss. 274, 130 So.2d 565 (1961)].

Franklin v. State, [189 Miss. 142, 196 So. 787 (1940)], a phone conversation of officer with informant was not inadmissible as hearsay. Hampton v. State, [99 Miss. 176, 54 So. 722 (1911)], evidence of an out of court conversation was competent to show the information on which a witness acted, and not for the purpose of establishing a material fact. Also U.S. v. Williamson, 450 F.2d 585 [(5th Cir.1971), Cert. Denied, 405 U.S. 1026, 92 S.Ct. 1297, 31 L.Ed.2d 486 (1972)] and McGowan v. State, [375 So.2d 987 (Miss. 1979)].
31A C.J.S. [Evidence] Sec. 239 [1964] `Where the fact that a particular statement was made is of itself a relevant fact, regardless of the truth or falsity of such statement, the statement is admissible in evidence as an independently relevant fact.'
We have given careful consideration to the record of the proceedings in this case and have found that there was ample evidence to support the jury's finding that Tolbert was guilty of the murder of Faust. While there are some contradictions in the evidence and some statements by Tolbert directed toward an innocent interpretation of certain of the circumstances in evidence, the jury was not required to accept these interpretations in the light of the overall evidence. The trial court did not err in declining to direct a verdict of not guilty.
We find no reversible error in the trial of this case and the conviction and sentence appealed from will be affirmed.
AFFIRMED.
PATTERSON, C.J., ROBERTSON, P.J., and SUGG, WALKER, BROOM, LEE, BOWLING and HAWKINS, JJ., concur.